886 So.2d 155 (2004)
Ex parte Hayden Jerome JACKSON.
(In re Hayden Jerome Jackson
v.
State of Alabama).
1021472.
Supreme Court of Alabama.
February 20, 2004.
*157 Glenn L. Davidson of Collins, Davidson, L.L.C., Mobile, for petitioner.
William H. Pryor, Jr., atty. gen., and Nathan A. Forrester, deputy atty. gen., and Michael B. Billingsley, asst. atty. gen., for respondent.
PER CURIAM.
On March 13, 2002, a Mobile County jury convicted Hayden Jerome Jackson of first-degree unlawful possession of marijuana, a violation of Ala.Code 1975, § 13A-12-213(a)(1).[1] The trial court sentenced him, as a habitual offender, to 15 years in prison. Ala.Code 1975, § 13A-5-9(b)(1). It then split the sentence and ordered him to serve three years; the balance of the sentence was suspended and he was placed on supervised probation for five years. The trial court also imposed a $2,000 fine pursuant to the Demand Reduction Assessment Act, § 13A-12-280 et seq., Ala.Code 1975. The Court of Criminal Appeals affirmed Jackson's conviction and sentence without an opinion. Jackson v. State, 886 So.2d 153 (Ala.Crim.App.2003). Jackson petitioned this Court for certiorari review. We granted the petition to review whether the roadblock-type stop conducted by the Mobile County Sheriff's Department, which resulted in Jackson's arrest, *158 was a valid stop or an invalid seizure that violated the Fourth Amendment. We hold that the roadblock-type stop was a valid stop that did not violate the United States Constitution, and we affirm.

Facts
The Mobile Housing Authority entered into a contract with the Mobile County Sheriff's Department pursuant to which the sheriff's department is permitted to enter housing areas governed by the housing authority at the request of the housing authority and performs such policing activities as rolling patrols, foot patrols, community policing, and safety checkpoints to establish some sort of "police presence." Pursuant to that contract, the Mobile County Sheriff's Department entered the R.V. Taylor housing project in Mobile on the evening of May 10, 2001, to set up what they called a "safety checkpoint" at a major intersection in the housing community. The housing authority had made no particular request for a roadblock-type stop in this instance; a captain in the sheriff's department made the decision to set up the roadblock-type stop. The officers checked driver's licenses, automobile insurance documentation, and vehicle "safety devices," e.g., seat belts, child restraints, etc., at the roadblock-type stop. They put in place seven marked sheriff's department vehicles at the intersection and stopped every vehicle that came through the intersection. They followed guidelines established by the sheriff's department while conducting the roadblock-type stop; those guidelines required that they perform no random searches and that the officers' activities be supervised by superior officers in the sheriff's department.
An officer stopped Jackson's vehicle at the roadblock. The officer discovered marijuana and two rolls of cash on Jackson's person; a larger quantity of marijuana in the console between the driver's seat and the passenger's seat; hidden under the tire cover in the trunk of Jackson's vehicle was an "Old Navy" store shopping bag that contained more marijuana, scales, and numerous plastic sandwich bags.
At trial, Jackson filed a motion to suppress the marijuana found on his person and in his vehicle on the basis that the roadblock-type stop was an unreasonable seizure that violated the Fourth Amendment to the United States Constitution.[2] After his conviction for first-degree unlawful possession of marijuana, Jackson filed a motion for a new trial, which the trial court denied. The trial court sentenced Jackson, as a habitual offender, to 15 years in prison; that sentence was split, and Jackson was ordered to serve 3 years in prison and 5 years' supervised probation. In his appeal to the Alabama Court of Criminal Appeals, Jackson argued that the trial court erred on the basis that the roadblock-style stop was an unreasonable seizure that violated the Fourth Amendment to the United States Constitution. *159 The Alabama Court of Criminal Appeals affirmed without an opinion. We affirm.

Standard of Review
The trial court held the suppression hearing outside the hearing of the jury; therefore, we review the evidentiary findings of the trial court at that hearing under the ore tenus standard.
"`Where evidence is presented to the trial court ore tenus in a nonjury case, a presumption of correctness exists as to the court's conclusions on issues of fact; its determination will not be disturbed unless clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence. Odom v. Hull, 658 So.2d 442 (Ala.1995). However, when the trial court improperly applies the law to the facts, no presumption of correctness exists as to the court's judgment. Ex parte Board of Zoning Adjustment of the City of Mobile, 636 So.2d 415 (Ala.1994).'
"[Ex parte Agee,] 669 So.2d [102,] at 104 [(Ala.1995)]. `Where the evidence before the trial court was undisputed the ore tenus rule is inapplicable, and the Supreme Court will sit in judgment on the evidence de novo, indulging no presumption in favor of the trial court's application of the law to those facts.' Stiles v. Brown, 380 So.2d 792, 794 (Ala.1980) (citations omitted)."
State v. Hill, 690 So.2d 1201, 1203 (Ala.1996).
Jackson contends that the trial court, in determining not to grant his motion to suppress, misapplied the law to the facts, which were undisputed; therefore, we review de novo the trial court's decision to not suppress the evidence. However, Jackson also contends that the evidence, specifically an officer's testimony with regard to both the purpose of the roadblock-type stop and the contract between the housing authority and the Mobile County Sheriff's Department, proves that the officers' intent was to use the roadblock-type stop not just to check driver's licenses and safety devices but to perform a general law-enforcement roadblock-type stop, thus making the stop an unreasonable seizure under the Fourth Amendment. The State contended, and the trial court agreed, that the roadblock-type stop was conducted solely to check driver's licenses and safety devices.

Analysis
Jackson contends that the Alabama Court of Criminal Appeals' unpublished memorandum conflicts with its decisions in Hagood v. Town of Town Creek, 628 So.2d 1057 (Ala.Crim.App.1993), and Cains v. State, 555 So.2d 290 (Ala.Crim.App.1989). In Jackson's case, the Court of Criminal Appeals found in its unpublished memorandum that the roadblock-type stop was valid because
"its primary purpose was to check for driver's licenses and safety equipment; that purpose could reasonably be advanced by a roadblock; the officers conducted the roadblock pursuant to department guidelines that allowed for very little discretion on the part of the officers conducting the roadblock; the roadblock was set up at a four-way stop in a highly visible area; there were seven marked vehicles parked around that location; and a typical stop lasted approximately one minute."
Based on that finding, the Court of Criminal Appeals concluded that the stop was reasonable and valid, and it affirmed the trial court's judgment. Jackson argues that the roadblock failed the "purpose" prong for determining whether such a stop is constitutional.
The United States Supreme Court has established criteria for determining *160 whether a roadblock-type stop is constitutional. "The Fourth Amendment imposes limits on search-and-seizure powers in order to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." United States v. Martinez-Fuerte, 428 U.S. 543, 554, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976). In circumstances like the seizure here, courts must "weigh[] the public interest against the Fourth Amendment interest of the individual." 428 U.S. at 554, 96 S.Ct. 3074. "[S]ome quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure." 428 U.S. at 560, 96 S.Ct. 3074. A suspicionless roadblock-type stop is a seizure.
"[S]topping an automobile and detaining its occupants constitute a `seizure' within the meaning of [the Fourth and Fourteenth] Amendments, even though the purpose of the stop is limited and the resulting detention quite brief."
Delaware v. Prouse, 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979).
However, the Supreme Court has made an exception to the suspicion requirement with respect to the routine roadblock-type stop:
"The [routine roadblock-type] stop does intrude to a limited extent on motorists' right to `free passage without interruption,' Carroll v. United States, 267 U.S. 132, 154 (1925), and arguably on their right to personal security. But it involves only a brief detention of travelers during which
"`"[a]ll that is required of the vehicle's occupants is a response to a brief question or two and possibly the production of a document...."' United States v. Brignoni-Ponce, [422 U.S. 873], at 880 [(1975)]."
Martinez-Fuerte, 428 U.S. at 557-58, 96 S.Ct. 3074. The Court reasoned:
"[T]his objective intrusion  the stop itself, the questioning, and the visual inspection  also existed in roving-patrol stops. But we view checkpoint stops in a different light because the subjective intrusion  the generating of concern or even fright on the part of lawful travelers  is appreciably less in the case of a checkpoint stop. In [United States v.] Ortiz, [422 U.S. 891 (1975),] we noted:
"`[T]he circumstances surrounding a checkpoint stop and search are far less intrusive than those attending a roving-patrol stop. Roving patrols often operate at night on seldom-traveled roads, and their approach may frighten motorists. At traffic checkpoints the motorist can see that other vehicles are being stopped, he can see visible signs of the officers' authority, and he is much less likely to be frightened or annoyed by the intrusion.' 422 U.S., at 894-895[, 95 S.Ct. 2585]."
428 U.S. at 558, 96 S.Ct. 3074 (emphasis added).
In Delaware v. Prouse, supra, the Supreme Court conditioned such stops of automobiles on the existence of an objective standard to check the arbitrary discretion of the officer in the field:
"[T]he reasonableness standard usually requires, at a minimum, that the facts upon which an intrusion is based be capable of measurement against `an objective standard,' whether this be probable cause or a less stringent test. In those situations in which the balance of interests precludes insistence upon `some quantum of individualized suspicion,' other safeguards are generally relied upon to assure that the individual's reasonable expectation of privacy is not `subject to the discretion of the official in *161 the field,' Camara v. Municipal Court, 387 U.S. [523], at 532 [(1967)]...."
440 U.S. at 654-55, 99 S.Ct. 1391 (footnotes omitted). In Prouse a police officer conducting a "roving-patrol stop" stopped a car at random to check the driver's license and the vehicle registration, without suspecting any improper driving on the driver's part. The United States Supreme Court determined that, unless the police officer has "at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered," such stops are unreasonable under the Fourth Amendment. 440 U.S. at 663, 99 S.Ct. 1391. However, that Court also said:
"This holding does not preclude the State of Delaware or other States from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion. Questioning of all oncoming traffic at roadblock-type stops is one possible alternative. We hold only that persons in automobiles on public roadways may not for that reason alone have their travel and privacy interfered with at the unbridled discretion of police officers."
440 U.S. at 663, 99 S.Ct. 1391 (footnote omitted; emphasis added). Therefore, the Supreme Court has distinguished between the "roving-patrol stop" and the roadblock-type stop, holding that under certain conditions the latter can be reasonable and, therefore, not unconstitutional.
In Brown v. Texas, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), the Supreme Court created a three-prong balancing test for determining whether a seizure is considered reasonable. In that case, the question was whether the officers' detention of a pedestrian, who, in violation of a Texas statute, refused to identify himself, was an unreasonable "seizure."
"Consideration of the constitutionality of such seizures involves a weighing of [1] the gravity of the public concerns served by the seizure, [2] the degree to which the seizure advances the public interest, and [3] the severity of the interference with individual liberty."
443 U.S. at 50-51, 99 S.Ct. 2637. In Michigan Department of State Police v. Sitz, 496 U.S. 444, 448-49, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990), the Supreme Court extended the application of these three conditions beyond the traditional arrest situation to roadblock-type stops, specifically to "sobriety checkpoints." The United States Supreme Court has explicitly upheld roadblock-type stops against constitutional challenges in four situations  stops gathering information concerning a recent crime in the area when the questions asked during the stop did not seek self-incriminating information; stops checking driver's licenses; drivers' sobriety; and the presence of illegal aliens. See Illinois v. Lidster, 540 U.S. 419, 124 S.Ct. 885, 157 L.Ed.2d 843 (2004); Texas v. Brown, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983); Sitz, supra; and Martinez-Fuerte, supra. The Alabama Court of Criminal Appeals ably summarized the United States Supreme Court precedent as to this issue in Cains v. State, 555 So.2d 290 (1989):
"Generally, a seizure less intrusive than a traditional arrest is reasonable if based on individualized suspicion, gathered from specific and articulate facts, that the individual is, or is about to be, engaged in criminal activity, Terry v. Ohio [, 392 U.S. 1 (1968)]; see also United States v. Cortez, 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981), or if the seizure is `carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers,' *162 Brown v. Texas, 443 U.S. 47, 51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979).
"The nature of a roadblock requires the stopping of cars without individualized suspicion of wrongdoing. Thus, if a roadblock stop is to be upheld, it must be on the second basis, i.e., because it is `carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers.' In a series of decisions stemming from the immigration control cases, the United States Supreme Court has rejected the individualized suspicion requirement for fixed, non-random automobile checkpoints or roadblock stops, and instead has established some criteria for `a plan embodying explicit, neutral limitations on the conduct of individual officers.'
"....
"Four years [after the Supreme Court's decision in Delaware v. Prouse, 440 U.S. 648 (1979)], the Court specifically approved drivers' license checkpoints in Texas v. Brown, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983)....
"When read together, [United States v.] Brignoni-Ponce[, 422 U.S. 873 (1975)], [United States v.] Martinez-Fuerte[, 428 U.S. 543 (1976)], Prouse, and Texas v. Brown[, 460 U.S. 730 (1983),] stand for the proposition that random stops or spot checks are unreasonable in the absence of individualized suspicion of wrongdoing; on the other hand, stops at fixed checkpoints or roadblocks are reasonable if they are carried out pursuant to a neutral and objective plan, are supported by a strong public interest, and are only minimally intrusive to the individual motorist."
555 So.2d at 292-93 (emphasis added).
The United States Supreme Court has held that driver's license checkpoints satisfy the first factor  that "the gravity of the public concerns served by the seizure" outweigh the Fourth Amendment interest of individuals. See Brown v. Texas, 443 U.S. at 51, 99 S.Ct. 2637; Texas v. Brown, supra. As for the second factor  "the degree to which the seizure advances the public interest"  there is no question that the public has an interest in making sure that drivers of vehicles are properly licensed and that the vehicles they are driving are registered and equipped with safety devices. The Court of Criminal Appeals stated in Hagood:
"`The states' interest in enforcing its registration and licensing laws and the difficulty in enforcing the laws by any other method' ... [has] been held sufficient to outweigh a minor intrusion upon persons stopped at roadblocks conducted for [that] purpose[]."
628 So.2d at 1060. Because the United States Supreme Court in Texas v. Brown, supra, has specifically upheld driver's license checkpoints as advancing the public interest, thus satisfying the second factor, we must ensure that in Jackson's case the State satisfied the third factor.
To analyze the third factor  "the severity of the interference with individual liberty"  we must determine whether the officers conducted the roadblock-type stop in a neutral and objective manner. As the Court of Criminal Appeals stated in Cains: "[S]tops [of vehicles] at fixed checkpoints or roadblocks are reasonable if they are carried out pursuant to a neutral and objective plan, are supported by a strong public interest, and are only minimally intrusive to the individual motorist." 555 So.2d at 293. We must determine if the *163 stop in Jackson's case was "minimally intrusive to the individual motorist." The Court of Criminal Appeals stated in Cains that "the manner of operation and the physical characteristics of a roadblock," 555 So.2d at 296, affect the intrusiveness of the stop. The Court of Criminal Appeals then quoted a 13-factor analysis adopted by the Kansas Supreme Court:
"`(1) The degree of discretion, if any, left to the officer in the field; (2) the location designated for the roadblock; (3) the time and duration of the roadblock; (4) standards set by superior officers; (5) advance notice to the public at large; (6) advance warning to the individual approaching motorist; (7) maintenance of safety conditions; (8) degree of fear or anxiety generated by the mode of operation; (9) average length of time each motorist is detained; (10) physical factors surrounding the location, type and method of operation; (11) the availability of less intrusive methods for combating the problem; (12) the degree of effectiveness of the procedure; and (13) any other relevant circumstances which might bear upon the test.'"
555 So.2d at 296 (quoting State v. Deskins, 234 Kan. 529, 541, 673 P.2d 1174, 1185 (1983)). We agree with the Court of Criminal Appeals that we should not exalt form over substance and that some of the 13 factors outlined above are not pivotal to determining whether a particular roadblock-type stop is "minimally intrusive." However, those factors are helpful considerations to take into account when determining whether the officers conducted the stop pursuant to an "objective standard."
We also agree with the Court of Criminal Appeals that because a roadblock-type stop to examine driver's licenses is warrantless and not based on an "articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered," Prouse, 440 U.S. at 663, 99 S.Ct. 1391, the State has the burden of proving that it was reasonable under the Fourth Amendment. Hagood, 628 So.2d at 1062.
In the case of the stop and seizure of Jackson, Sgt. Frank Cassidy authorized the "safety checkpoint" to be conducted on the evening of May 10, 2001, in a heavily traveled area in the R.V. Taylor Housing Project; the roadblock-type stop was to be conducted in accordance with guidelines for such stops established by the Mobile County Sheriff's Department. For example, in compliance with the guidelines, the officers checked the driver of every vehicle for a driver's license, proof of automobile liability insurance, and safety equipment; there were no random checks. Therefore, the officers in the field had no discretion in deciding whom to stop. Each stop lasted approximately one minute, unless the officers found problems with the paperwork or safety equipment. "Superior officers" were involved in the planning, placement, and timing of the roadblock; Cpt. Crosby, of the criminal section of the sheriff's department, had instructed Sgt. Cassidy to set up the stop at the R.V. Taylor Housing Project. The contract between the housing authority and the sheriff's department mentions "safety checkpoints," but it does not instruct the sheriff's department as to how to set up such checkpoints.
Based on the facts presented at the suppression hearing, the trial court did not err in determining that the roadblock-type stop was a valid and constitutional means of protecting the public from unlicensed drivers and unsafe vehicles. The officers' discretion was limited by the guidelines established by the sheriff's department for conducting such stops, thereby creating a neutral and objective plan, which limited the officers' discretion. A "superior" officer was involved in planning and authorizing *164 the stop. The intrusion upon the drivers was minimal because it involved only checking to determine whether the driver had the paperwork drivers are required to carry in their vehicles, and the stops lasted only about one minute. There was no evidence to indicate what safety precautions the officers took; however, that is not a controlling factor. The presence of seven marked law-enforcement vehicles gave adequate warning to oncoming drivers that the stop was authorized and organized by law-enforcement personnel.
Jackson essentially alleges that the roadblock-type stop was unconstitutional because, he argues, it was in reality a subterfuge for a general law-enforcement-type checkpoint. If a trial court determines that the roadblock-type stop is valid, the burden is on the defendant to prove that the expressed reason for the stop is a subterfuge and that the stop was actually conducted for an invalid purpose.
Jackson focuses on the testimony of Sgt. Cassidy and the contract between the housing authority and the Mobile County Sheriff's Department to support his claim. He quotes the following excerpts from the trial transcript:
"Q. All right. So your testimony is the Mobile Housing [Authority] was concerned about the traffic violations in the projects and wanted you guys to go in and check on people's driver's licenses?
"A. Housing projects  housing board authorities did not specify what they wanted us to do. We were asked to put a presence inside R.V. Taylor and we arrived. I took a six-man unit into R.V. Taylor.
"Q. Is there anything in writing from the Housing [Authority] that you received showing what type of presence you were supposed to be doing?
"A. We have a contract with them that specifies that we will go into an area that they govern at their request. It states that we will do rolling patrol, foot patrol, community policing, safety checkpoints.
"....
"Q. And it's your testimony that the Housing [Authority] has given a contract with the Sheriff's Department to check the safety equipment?
"....
"A. That's not what I said. The Housing [Authority] has a contract with the Sheriff's Department to put units patrolling inside different housing projects at dates at their request. They did not ask us specifically to check for safety equipment. They asked for us to provide patrol unit in the presence in there [sic].
"....
"Q. And the Housing [Authority] was  I guess you said they have some kind of contract with the County Sheriff's Department where they want you to come in and check for problems they have?
"A. They come in and ask us to make a presence and then patrol the area, yes, sir.
"Q. Okay. To prevent crime from happening?
"A. I don't know. That's not stated in there. I was just told to go in and put in a presence into R.V. Taylor.
"Q. Why do you think they would want a presence of law enforcement officers?
"A. I would assume that crime determent [sic]  deterrence would be one.
"Q. Okay.
"A. R.V. Taylor is used as a crossover street between Michigan Avenue and stuff. There's a lot of pedestrians. I would think the traffic would be a severe problem there. We have a lot of people *165 that speed. A lot of people use it as a cut-through. We have a lot of people on bicycles and stuff, so I would think traffic, crime deterrent.
"Q. So they wanted y'all to enforce the traffic laws on Michigan Avenue for pedestrians?
"A. You asked me what I thought they would want us for, and I would think traffic control, deter crime, or any type of crime, just a high presence."
Jackson argues that this testimony, considered in conjunction with the contract between the housing authority and the sheriff's department, which uses the words police "presence," indicates that the primary purpose of the safety checkpoint in this case was general law enforcement, a purpose that invalidates a "checkpoint stop." "The Supreme Court has never upheld ... a police roadblock designed to promote general law enforcement purposes." Galberth v. United States, 590 A.2d 990, 998 (D.C.Ct.App.1991). He analogizes his case to Hagood, supra, in which the Alabama Court of Criminal Appeals determined that, based on the testimony of the chief of police that he had ordered the driver's license checkpoint because of "`trouble'  `fighting, [public] drunk [enness] and disorderly [conduct]'  at the Town Creek Apartments," 628 So.2d at 1060, the checkpoint was for the purpose of "preventing criminal activity in general." 628 So.2d at 1060. The Court of Criminal Appeals stated that "this general interest in law enforcement simply does not outweigh the liberty interests of those seized," 628 So.2d at 1060, and that the "goal of preventing `trouble' in the Town Creek Apartments could have been accomplished without intruding on the liberty rights of individual motorists simply by stationing a police officer in the parking lot of the apartments." 628 So.2d at 1061. The Court of Criminal Appeals, therefore, held that the roadblock-type stop in Town Creek was an unconstitutional seizure.
There were other problems with the Hagood checkpoint. When the officers waited "a couple of hours" at one location and found no traffic, 628 So.2d at 1058, they moved to another location. Two of the four officers testified that the "roadblocks were conducted upon the `mutual agreement' of the four officers." 628 So.2d at 1058. There were no formal guidelines, very few safety precautions at the location of the stop, and the officers had not been trained in how to conduct the stops. Therefore, in Hagood the evidence supporting the existence of an "objective and neutral plan" was lacking.
We have a very different situation in this case. Other than the inferential suspicion based on the word "presence" in Sgt. Cassidy's testimony and the contract between the sheriff's department and the housing authority,[3] Jackson presented no evidence to prove that this particular roadblock-type stop was for a general law-enforcement purpose. Therefore, we hold that Jackson has not sufficiently proven that the license checkpoint was a subterfuge for a general law-enforcement "checkpoint stop."

Conclusion
We adopt the rationale used by the Alabama Court of Criminal Appeals in Cains, supra, for determining whether a roadblock-type stop is constitutional. Jackson has failed to show that the stop by the Mobile County Sheriff's Department in his case was for an invalid purpose, i.e., general law enforcement, as was the license checkpoint in Hagood, supra. Therefore, we affirm the judgment of the Court of Criminal Appeals.
AFFIRMED.
*166 HOUSTON, SEE, BROWN, HARWOOD,[*] WOODALL, and STUART, JJ., concur.
LYONS, J., concurs specially.
JOHNSTONE, J., dissents.
LYONS, Justice (concurring specially).
I concur in the main opinion. I write specially to state that I am not persuaded that Jackson overcame the presumption of correctness that attaches to the trial court's finding based on ore tenus evidence that the roadblock-type stop conducted to check driver's licenses was not a subterfuge for a stop conducted for general law-enforcement purposes.
NOTES
[1] Section 13A-12-213, Ala.Code 1975, provides:

"(a) A person commits the crime of unlawful possession of marihuana in the first degree if, except as otherwise authorized:
"(1) He possesses marihuana for other than personal use; or
"(2) He possesses marihuana for his personal use only after having been previously convicted of unlawful possession of marihuana in the second degree or unlawful possession of marihuana for his personal use only.
"(b) Unlawful possession of marihuana in the first degree is a Class C felony."
[2] The Fourth Amendment to the United States Constitution states:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."
The United States Supreme Court has held that the protections of the Fourth Amendment extend to the states through the operation of the Due Process Clause of the Fourteenth Amendment. Wolf v. People of State of Colorado, 338 U.S. 25 (1949); Mapp v. Ohio, 367 U.S. 643[, 81 S.Ct. 1684, 6 L.Ed.2d 1081] (1961).
[3] Neither the State nor Jackson ever offered the contract into evidence at trial.
[*] Although Justice Harwood was not present at oral argument, he has listened to the audiotapes of oral argument.