JOINER, Judge,
dissenting.
I respectfully dissent from the holding of the majority opinion that “the evidence obtained pursuant to [the checkpoint] stop should have been suppressed.” Although the majority opinion correctly summarizes the relevant facts and correctly quotes the appropriate law, I dissent from its conclusion — that “the State did not carry its burden of proving reasonableness of the checkpoint stop” because “there is no ... evidence of a plan that placed explicit, neutral limitations on the conduct of the officers” — because the facts, as presented to the district court, provided an appropriate basis for that court to conclude that a “plan embodying explicit, neutral limitations on the conduct of individual officers” existed for the operation of this checkpoint.
Initially, I note that
“ ‘ “[w]hen evidence is presented ore tenus to the trial court, the court’s findings of fact based on that evidence are presumed to be correct,” Ex parte Perkins, 646 So.2d 46, 47 (Ala.1994); “[w]e indulge a presumption that the trial court properly ruled on the weight and probative force of the evidence,” Bradley v. State, 494 So.2d 750, 761 (Ala.Crim.App.1985), aff'd, 494 So.2d 772 (Ala.1986); and we make “ ‘all the reasonable inferences and credibility choices supportive of the decision of the trial court.’ ” Kennedy v. State, 640 So.2d 22, 26 (Ala.Crim.App.1993), quoting Bradley, 494 So.2d at 761. “[A]ny conflicts in the testimony or credibility of witnesses during a suppression hearing is a matter for resolution by the trial court.... Absent a gross abuse of discretion, a trial court’s resolution of [such] conflicts] should not be reversed on appeal.” Sheely v. State, 629 So.2d 23, 29 (Ala.Crim.App.1993) (citations omitted). However, “ ‘[w]here the evidence before the trial court was undisputed the ore tenus rule is inapplicable, and the [appellate] Court will sit in judgment on the evidence de novo, indulging no presumption in favor of the trial court’s application of the law to those facts.’ ” State v. Hill, 690 So.2d 1201, 1203 (Ala.1996), quoting Stiles v. Brown, 380 So.2d 792, 794 (Ala.1980). “‘“[W]hen the trial court improperly applies the law to the facts, no presumption of correctness exists as to the court’s judgment.” ’ ” Ex parte Jackson, 886 So.2d 155, 159 (Ala.2004), quoting Hill, 690 So.2d at 1203, quoting in turn Ex parte Agee, 669 So.2d 102, 104 (Ala.1995). A trial court’s ultimate legal conclusion on a motion to suppress based on a given set of facts is a question of law that is reviewed de novo on appeal. See State v. Smith, 785 So.2d 1169 (Ala.Crim.App.2000).’ ”
C.B.D. v. State, 90 So.3d 227, 237 (Ala.Crim.App.2011) (quoting State v. Hargett, 935 So.2d 1200, 1203-04 (Ala.Crim.App.2005)).
This Court has long held that license checks, sobriety checkpoints, and roadblocks are not intrinsically unconstitutional. McInnish v. State, 584 So.2d 935, 936 (Ala.Crim.App.1991). In order for a checkpoint to be constitutionally permissible, the stop must be reasonable. Hagood v. Town of Toum Creek, 628 So.2d 1057, 1059 (Ala.Crim.App.1993). In Cains v. State, 555 So.2d 290 (Ala.Crim.App.1989), this Court held that stops of vehicles at fixed checkpoints are reasonable if they are performed according to a neutral and objective plan, are supported by strong public interest, and are minimally intrusive to the individual being stopped. Essentially, the particular purpose or interest must sufficiently outweigh the invasion of privacy resulting from the checkpoint stop. See Hagood, 628 So.2d at 1062. In Cains, this *277 Court adopted the balancing test set forth in Brown v. Texas, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), to determine whether a seizure is unreasonable. Cains, 555 So.2d at 294. This balancing test involves
“a weighing of [1] the gravity of the public concerns served by the seizure, [2] the degree to which the seizure advances the public interest, and [3] the severity of the interference with individual liberty.”
Cains, 555 So.2d at 294 (quoting Brown v. Texas, 443 U.S. 47, 50-51, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979)). The United States Supreme Court has extended the application of this balancing test beyond the traditional arrest situation to roadblock-type stops and specifically to “sobriety checkpoints.” Michigan Dep’t of State Police v. Sitz, 496 U.S. 444, 448-49, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990).
When evaluating the Brown three-prong balancing test, the United States Supreme Court has held that driver’s license checkpoints satisfy the first prong — that “the gravity of the public concerns served by the seizure” outweigh the Fourth Amendment interest of individuals. See Brown, 443 U.S. at 51. As for the second factor— “the degree to which the seizure advances the public interest” — the Alabama Supreme Court has held:
“[TJhere is no question that the public has an interest in making sure that drivers of vehicles are properly licensed and that the vehicles they are driving are registered and equipped with safety devices. The Court of Criminal Appeals stated in Hagood:
“ ‘ “The [State’s] interest in enforcing its registration and licensing laws and the difficulty in enforcing the laws by any other method” ... [has] been held sufficient to outweigh a minor intrusion upon persons stopped at roadblocks conducted for [that] purpose[ ].’ ”
Ex parte Jackson, 886 So.2d 155, 162 (Ala. 2004) (quoting Hagood, 628 So.2d at 1060). Thus, both the first and second prong of the analysis are satisfied; therefore, the constitutionality of a checkpoint turns on the third factor — “the severity of the interference with individual liberty.”
To analyze the third factor we must determine whether the officers conducted the checkpoint in a neutral and objective manner. Essentially, we must determine if the stop was “minimally intrusive to the individual motorist.” To make this determination this Court applies a 13-factor analysis:
“ ‘(1) The degree of discretion, if any, left to the officer in the field; (2) the location designated for the roadblock; (3) the time and duration of the roadblock; (4) standards set by superior officers; (5) advance notice to the public at large; (6) advance warning to the individual approaching motorist; (7) maintenance of safety conditions; (8) degree of fear or anxiety generated by the mode of operation; (9) average length of time each motorist is detained; (10) physical factors surrounding the location, type and method of operation; (11) the availability of less intrusive methods for combating the problem; (12) the degree of effectiveness of the procedure; and (13) any other relevant circumstances which might bear upon the test.’ ”
Cains, 555 So.2d at 296 (quoting State v. Deskins, 234 Kan. 529, 541, 673 P.2d 1174, 1185 (1983)). These 13 factors, however, are “not pivotal to determining whether a particular roadblock-type stop is ‘minimally intrusive’” but, instead, are “helpful considerations to take into account when determining whether the officers conducted the stop pursuant to an ‘objective stan *278 dard.’” Ex parte Jackson, 886 So.2d at 168.
Here, the State’s evidence regarding the checkpoint procedures was as follows: Corporal Jesse Thornton, a supervisor with the Alabama State Troopers, testified that over the “4th of July weekend ... [the Alabama State Troopers conducted] several sobriety checkpoints in an effort to deter drunk driving and possibly deter motor vehicle crashes in certain areas of certain counties.” (R. 7.) Corporal Thornton testified that one of those checkpoints was conducted on July 2, 2011, “outside of Tallassee on Friendship Road at Cherokee Trail” — the location at which Ogburn was stopped and arrested. (R. 7.) Corporal Thornton testified that on July 2, 2011, his main duty was “field supervision as well as being out with the troopers.” (R. 7.) Corporal Thornton testified that the Alabama State Troopers have established policies for checkpoints. According to Corporal Thornton, it was his decision to set up the checkpoint on Friendship Road, and he chose that location because of “safety” and because “it’s a pretty heavily traveled area.” (R. 8.) Corporal Thornton explained that “[t]he main objective ... [was] to possibly deter crashes in that area caused by impaired drivers.” (R. 8.) Corporal Thornton further testified that the checkpoint was situated in a location that made it visible to motorists; that motorists were able to pull out of the stream of traffic without causing any significant interruption in the flow of traffic; that the troopers used their emergency equipment to alert oncoming motorists of the presence of the checkpoint; that the troopers were wearing reflective vests and were equipped with flashlights; that the troopers “checked all vehicles that [came] through that location that night” (R. 12); and that the checkpoint was conducted from 9:00 p.m. until 11:00 p.m. Corporal Thornton explained that the time and location of the checkpoint as well as the officers assigned to the checkpoint were determined before the checkpoint started.
Trooper Eric Salvador testified that, on July 2, 2011, he was assigned to check vehicles at a “standardized sobriety checkpoint ]” and that he came into contact with Ogburn. (R. 17 (emphasis added).) On cross-examination, Trooper Salvador explained the “standardized sobriety checkpoint ]” procedure as follows:
“[Ogburn’s counsel]: Once a car pulled up to the roadblock, what was the procedure that was done?
“[Trooper Salvador]: Asked for driver’s license and proof of insurance.
“[Ogburn’s counsel]: And if the individual could produce a driver’s license and proof of insurance, were they allowed to move forward?
“[Trooper Salvador]: If they had a current valid driver’s license and a current insurance card, that’s correct, if we didn’t suspect that they were under the influence of alcohol.
“[Ogburn’s counsel]: And so that was all you did to the general public [?] You asked for the driver’s license. You asked for the proof of insurance. If they were able to produce a current driver’s license and current proof of insurance, they were allowed to move on, right?
“[Trooper Salvador]: Yes, sir. Correct.”
(R. 28-24 (emphasis added).) After questioning Trooper Salvador about the procedures of the checkpoint and how he treated the “general public,” Ogburn’s counsel then posed the following hypothetical question to Trooper Salvador:
“[Ogburn’s counsel]: Now, if you’re driving through — I’m sorry. If an automobile is approaching the roadblock and comes up to it and you notice that it’s *279 one of our local circuit judges, did you have the authority and discretion to wave them on through and not ask for that?
[[Image here]]
“[Trooper Salvador]: I’d check everybody, sir.
“[Ogburn’s counsel]: But did you have the discretion to wave them through?
“[Trooper Salvador]: Yes, sir. I would assume so.”
(R. 24-25.) During Trooper Salvador’s testimony, Ogburn raised the following objection regarding the constitutionality of the checkpoint:
“[T]he only way that this evidence can come in is if it has been established that the roadblock was reasonable and met all U.S. Supreme Court cases. And it is our position that the State has not done that and has completely failed to make that showing. I think the Court is well aware of the cases that say that all roadblocks are presumed to be unlawful unless and until the State produces evidence to show that they are — meet all the requirements. And the State has not shown that. They have not shown it at all. They haven’t introduced a policy for this particular roadblock or a policy in general of the Alabama State Troopers. So we would object as the predicate hasn’t been laid for the testimony that [Trooper] Salvador is giving.”
(R. 18-19.) The district court, however, in overruling Ogburn’s objection, found as follows:
“I think they have shown that — I’m not going to debate it, but they’ve shown the policy was two hours, the reason they did it, that he approved it. He was the supervisor, that they do have that policy and it did have an effect on this case. I understand the document that was generated was not a policy or even a written policy,[2] but it was generated basically showing what they did that night. So I do think that’s in fulfillment of Sitz.”[3]
(R. 19.) At the close of the State’s casein-chief, Ogburn renewed his objection regarding the constitutionality of the checkpoint, and the district court again overruled Ogburn’s objection and found as follows:
“Based on the things that you did mention, I’m not going to — I’m not going to debate it, but I did hear testimony that basically they’re stopping each car, every car. He did say something about discretion to wave a circuit judge through. But he said he stopped every car. And he said he asked everybody for their driver’s license and insurance and would only do something extra if they noticed alcohol, had a suspicion. I think that’s pretty reasonable and common sense, and they said it was for two hours. I find that they met those things.”
*280 (R. 61.) Thus, the district court, based on the facts presented, determined that a “plan embodying explicit, neutral limitations on the conduct of individual officers” existed.
Evaluating the above-detailed facts, however, the majority opinion concludes:
“In the present situation, ... there is no other evidence of a plan that placed explicit neutral limitations on the conduct of the officers. Corporal Thornton testified that the troopers have established policies concerning the establishment of checkpoints, but he did not give any testimony concerning the substance of those policies or concerning how those policies placed explicit neutral limitations on the conduct of the officers working the checkpoint. The State also presented evidence concerning the way the officers actually carried out the checkpoint in the present case, but the State did not present any evidence concerning whether the way the officers carried out the checkpoint was in accordance with a plan embodying explicit, neutral limitations on the officers’ conduct. There is simply no evidence indicating that the officers in the field were given any particular instructions before the checkpoint began concerning how they were to conduct the checkpoint or concerning the extent of their discretion. The only specific evidence concerning the officers’ discretion was the testimony of Trooper Salvador who testified that, although he in fact stopped every vehicle that passed through the checkpoint, he assumed that he had the discretion to allow a circuit judge to pass through the checkpoint without being stopped. Furthermore, there is no evidence indicating that the officers’ discretion at the checkpoint was supervised by any official that was not in the field.”
(Emphasis added.) In other words, the majority opinion concludes that testimony establishing how a checkpoint was conducted is not evidence that can properly support a trial court’s conclusion that a “plan embodying explicit, neutral limitations on the officers’ conduct” existed.
That conclusion, however, disregards our well-established ore tenus standard of review, under which we make “ ‘all the reasonable inferences ... supportive of the decision of the trial court.’ ” C.B.D., supra, (citations omitted). From the testimony at trial, the district court could have inferred that a “plan embodying explicit, neutral limitations on the conduct of individual officers” existed because the testimony established that Trooper Salvador did not choose the date of the checkpoint, did not choose the location of the checkpoint, did not choose the time the checkpoint was to occur, did not choose the duration of the checkpoint, did not establish the purpose of the checkpoint, had no control over whether he would be assigned to work the checkpoint, and did, in fact, stop every vehicle that passed through the checkpoint. Thus, I cannot say that the district court grossly abused its discretion when it concluded that “there was a policy in place beforehand.” (R. 15.)
Furthermore, the majority opinion, in reaching its conclusion that nothing limited the troopers’ discretion, focuses solely on Trooper Salvador’s statements that he “stopped every vehicle” and his assumption that “he had the discretion to allow a circuit judge through without being stopped.”[4] The majority opinion, however, fails to consider that Trooper Salvador, as stated above, had no discretion in ehoos- *281 ing the location of the checkpoint; no discretion in choosing the time the checkpoint would occur; no discretion in choosing the duration of the checkpoint; no discretion in the purpose of the checkpoint; and no discretion as to whether he was assigned to work the checkpoint. That discretion, instead, was vested in Corporal Thornton. Because Trooper Salvador was told by a superior officer that he was assigned to a checkpoint, was told where the checkpoint would occur, was told what time the checkpoint would occur, had no control over the purpose of the checkpoint, and stopped each vehicle that passed through the checkpoint, I would hold that the district court did not grossly abuse its discretion in finding that a neutral and objective plan was established that left the troopers with very little discretion. See Ex parte Jackson, supra (holding that a roadblock was valid where the officers had no discretion in deciding whom to stop and where a superior officer was involved in the planning, placement, and timing of the roadblock); cf. Hagood, 628 So.2d 1057 (in holding that the checkpoint was unconstitutional, this Court found that the police officers conducted the checkpoint with “unfettered” discretion). Accordingly, I would affirm the judgment of the district court.
Based on the foregoing reasons, I respectfully dissent.
KELLUM, J., concurs.

. I agree with the majority opinion’s holding that a written plan is not required to support the constitutionality of a checkpoint. There is no binding authority that stands for the proposition that written guidelines are a mandatory requirement of a valid checkpoint. See Sitz, supra, Stone v. State, 705 So.2d 1316 (Ala.Crim.App.1996), Hagood, supra.

. The document to which the district court refers is the "vehicle checkpoint” form. Although the record is unclear as to whether the district court admitted the form as an exhibit, the State moved to admit the form as "Exhibit A” (R. 12); Ogburn objected to its admission (R. 13-15), and the district court overruled Ogburn’s objection (R. 15). The form is signed by Corporal Thornton as the supervisor, lists the "approved checkpoint location,” indicates the date and duration of the checkpoint, lists the troopers assigned to work the checkpoint, and details the number of vehicles checked and of arrests made at the checkpoint. (C. 11.)

. It should be noted that the majority opinion adds the phrase “without being stopped” to Ogburn’s circuit-judge hypothetical. That phrase, however, does not appear in the exchange between Ogburn's counsel and Trooper Salvador:
“[Ogburn's counsel]: Now, if you’re driving through — I’m sorry. If an automobile *281 is approaching the roadblock and comes up to it and you notice that it's one of our local circuit judges, did you have the authority and discretion to wave them on through and not ask for that?
[[Image here]]
"[Trooper Salvador]: I'd check everybody, sir.
"[Ogburn’s counsel]: But did you have the discretion to wave them through?
"[Trooper Salvador]: Yes, sir. I would assume so.”
(R. 24-25.)