983 So.2d 1141 (2007)
Alan Thomas CAMP
v.
STATE of Alabama.
CR-05-1207.
Court of Criminal Appeals of Alabama.
April 27, 2007.
Rehearing Denied June 29, 2007.
Certiorari Denied October 26, 2007.
*1142 Britt Cauthen, Decatur, for appellant.
Troy King, atty. gen., and Tracy Daniel, asst. atty. gen., for appellee.
Alabama Supreme Court 1061481.
PER CURIAM.
The appellant, Alan Thomas Camp, pleaded guilty to possessing methamphetamines and drug paraphernalia, violations of §§ 13A-12-212 and 13A-12-260, Ala. Code 1975. Camp was sentenced to 3 years' imprisonment for possessing methamphetamines and to 180 days in the Morgan County jail for possessing drug paraphernalia, both sentences to run concurrently. The court split the sentence and ordered Camp to serve 180 days in the county jail and 3 years on probation. Before entering his guilty plea, Camp specifically reserved his right to appeal the circuit court's ruling denying his motion to suppress the evidence seized as a result of what he alleges was an illegal search and seizure.
The evidence at the suppression hearing established the following. Shannon Wayne Ferguson, a deputy with the Morgan County Sheriff's Department, testified that in the early morning hours of August 21, 2004, at approximately 3:30 a.m., he was in his patrol car on his way to Falkville when he saw a vehicle "parked down beside a *1143 bridge in Lacon." He pulled down to where the vehicle was with his spotlights on to see if the driver was in trouble. The vehicle was parked with the rear facing the water and the nose of the vehicle facing the road. When he pulled near the vehicle he asked the driver to show both his hands. After he asked three times, Camp, the driver of the vehicle, complied. Deputy Ferguson asked for his identification, checked his identification, and found that Camp was from Hayden. Deputy Ferguson said that while he was checking his identification Camp was moving "very furiously around in the vehicle." He said that he asked him to step out of the vehicle because he was afraid that Camp had a weapon. Deputy Ferguson then inquired as to why he was at that place at 3:30 a.m. in the morning. Camp said that he was meeting a friend to go fishing. Camp refused to identify the friend, Deputy Ferguson said, but he said the friend was from Georgia and they were going to Lake Smith. Deputy Ferguson testified that he wondered why the two were meeting in Lacon to go to Lake Smith when they could have met at other areas closer to Lake Smith which, he said, was further south. Deputy Ferguson asked Camp if he could search his vehicle and Camp responded that he could not. Camp got out of his vehicle and locked it, using his remote keyless entry device. Deputy Ferguson stated that he was having trouble communicating with his dispatcher because the area he was located in was lower than the surrounding area. Deputy Ferguson said that he wanted to secure Camp in a safe place so that he could look through the windows of Camp's vehicle to make certain that there were no weapons or contraband in plain view. Deputy Ferguson, with the assistance of another officer who had arrived at the scene, put Camp in his patrol car while he went back to the vehicle to look through the windows. Deputy Ferguson said that he saw a syringe on the back floorboard and a piece of aluminum foil. He then searched the vehicle and found methamphetamine pills under a stack of papers beneath the armrest.
Troy Harville, a police officer with the City of Falkville, testified that he was dispatched to Lacon in the early morning hours of August 21, 2004, to assist a fellow police officer. When he arrived at the location he observed "Officer Ferguson and the subject standing in front of the patrol car, having what I considered a confrontation." He said: "It set me on edge that he was  had that demeanor, and two police officers standing in front of him in a situation in the area we was at and the time of the morning, he seemed uncompliant [sic], as an average person would be trying to explain or comply." The officers placed handcuffs on Camp, and Harville explained the reason for putting Camp in handcuffs: "His demeanor, again, could have been a threat to us or could have ran off, or fled from us and the vehicle was some distance away, and we didn't know who might be in the vehicle with him or what the situation was, so we were determined to place him in cuffs, and then go look in the vehicle just to check and see what or may not be there." (R. 30.) After placing Camp in Deputy Ferguson's patrol car they walked back to Camp's vehicle, looked into the vehicle with a flashlight, and saw a syringe on the back floorboard. Officer Harville also said that he saw a piece of aluminum foil with a powder residue on it through the window.
Camp also testified at the suppression hearing. He said: "I'd just got back into my vehicle from relieving myself, and the lights came up on me and  just blinding lights, and I locked my doors and put my keys in the ignition, because I didn't know who it was." Camp said that Deputy Ferguson got very agitated when *1144 he went for his identification, and "it just escalated." "He asked me if I would consent to a search, and I said, no, and at some point he wanted the keys to my truck and I had told him that I had thrown them in the bushes or that I had lost them, I'm not sure which."
"`"Where evidence is presented to the trial court tore tenus in a nonjury case, a presumption of correctness exists as to the court's conclusions on issues of fact; its determination will not be disturbed unless clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence. Odom v. Hull, 658 So.2d 442 (Ala.1995). However, when the trial court improperly applies the law to the facts, no presumption of correctness exists as to the court's judgment. Ex parte Board of Zoning Adjustment of the City of Mobile, 636 So.2d 415 (Ala. 1994)."
"`[Ex parte Agee,] 669 So.2d [102,] at 104 [(Ala.1995)]. "Where the evidence before the trial court was undisputed the ore tenus is inapplicable, and the Supreme Court will sit in judgment on the evidence de novo, indulging no presumption in favor of the trial court's application of the law to those facts."'"
Ex parte Jackson, 886 So.2d 155, 159 (Ala. 2004), quoting State v. Hill, 690 So.2d 1201, 1203 (Ala.1996). Here, the evidence presented at the suppression hearing was disputed.
Camp argues that Deputy Ferguson's actions exceeded the duration and scope of a constitutionally valid investigatory Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), stop; therefore, he argues, the evidence recovered from his vehicle should have been suppressed. Camp correctly acknowledges that there was no seizure when Deputy Ferguson first approached his parked vehicle.[1]
"The Fourth Amendment prohibits `unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." United States v. Arvizu, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002).
"It is well established that officers conducting a traffic stop may `take such steps as [are] reasonably necessary to protect their personal safety.' United States v. Hensley, 469 U.S. 221, 235, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985). This includes conducting a protective search of the driver, Pennsylvania v. Mimms, 434 U.S. 106, 111, 112, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), the passengers, id., and the vehicle, Michigan v. Long, 463 U.S. 1032, 1049-51, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). The officer may seize any contraband, including weapons, in plain view. Id. at 1049, 103 S.Ct. 3469. The officer may use a flash light to illuminate a vehicle's dark interior. United States v. Dunn, 480 U.S. 294, 305, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987). The officer may also prolong the detention to investigate the driver's license *1145 and the vehicle registration, Prouse, 440 U.S. at 657-59, 99 S.Ct. 1391, and may do so by requesting a computer check. United States v. Simmons, 172 F.3d 775, 778 (11th Cir.1999); Pruitt, 174 F.3d at 1219. See also United States v. Hunnicutt, 135 F.3d 1345, 1349 (10th Cir.1998); Foote v. Dunagan, 33 F.3d 445, 448-50 (4th Cir.1994); United States v. Shabazz, 993 F.2d 431, 437 (5th Cir.1993); McFadden v. United States, 814 F.2d 144, 147 (3d Cir.1987)."
United States v. Purcell, 236 F.3d 1274, 1277-78 (11th Cir.2001).
A routine traffic stop may be prolonged if police have a "reasonable suspicion" of other criminal activity.
"[I]f reasonable suspicion of additional criminal activity arises in the course of a stop and before the purpose of the stop is fulfilled, then a continued detention may be justified until the new suspicion has been confirmed or dispelled. Thus, an investigation pursuant to a traffic stop `may last as long as is reasonably necessary to effectuate the purpose of the stop, including the resolution of reasonable suspicion, supported by articulable facts within the officer's professional judgment, that emerges during the stop.'"
St. George v. State, 197 S.W.3d 806, 817 (Tex.App.2006).
In R.W. v. State, 913 So.2d 505, 510-11 (Ala.Crim.App.2005), we stated the following concerning "reasonable suspicion":
"[R]easonable suspicion is determined not by looking at each circumstance individually, but by looking at the totality of the circumstances surrounding the incident. As explained by the United States Supreme Court:
"`When discussing how reviewing courts should make reasonable-suspicion determinations, we have said repeatedly that they must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing. See, e.g., [United States v. Cortez, 449 U.S. 411] at 417-418 [(1981)]. This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that "might well elude an untrained person." Id., at 418. See also Ornelas v. United States, 517 U.S. 690, 699 (1996) (reviewing court must give "due weight" to factual inferences drawn by resident judges and local law enforcement officers). Although an officer's reliance on a mere "`hunch'" is insufficient to justify a stop, Terry [v. Ohio, 392 U.S. 1] at 27 [(1968)], the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard, [United States v.] Sokolow, [490 U.S. 1] at 7 [(1989)].
"`. . . .
"`We think that the approach taken by the Court of Appeals here departs sharply from the teachings of these cases. The court's evaluation and rejection of seven of the listed factors in isolation from each other does not take into account the "totality of the circumstances," as our cases have understood that phrase. The court appeared to believe that each observation by [the arresting officer] that was by itself readily susceptible to an innocent explanation was entitled to "no weight." See [United States v. Arvizu,] 232 F.3d [1241] at 1249-1251 [(9th Cir.2000)]. Terry, however, precludes this sort of divide-and-conquer analysis. The officer in Terry observed *1146 the petitioner and his companions repeatedly walk back and forth, look into a store window, and confer with one another. Although each of the series of acts was "perhaps innocent in itself," we held that, taken together, they "warranted further investigation." 392 U.S., at 22. See also Sokolow, supra, at 9 (holding that factors which by themselves were "quite consistent with innocent travel" collectively amounted to reasonable suspicion).'"
"United States v. Arvizu, 534 U.S. 266, 273-75, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)."
The United States Supreme Court in United States v. Sokolow, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), stated:
"The Fourth Amendment requires `some minimal level of objective justification' for making the stop. INS v. Delgado, 466 U.S. 210, 217, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247 (1984). That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence. We have held that probable cause means `a fair probability that contraband or evidence of a crime will be found,' Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983), and the level of suspicion required for a Terry stop is obviously less demanding than that for probable cause, see United States v. Montoya de Hernandez, 473 U.S. 531, 541, 544, 105 S.Ct. 3304, 3310, 3312, 87 L.Ed.2d 381 (1985)."
Here, Deputy Ferguson approached Camp's vehicle, which was parked by a bridge in a remote location at 3:30 a.m. Camp made furtive movements with his hands and moved around inside the vehicle "very furiously." Camp appeared nervous, refused to identify whom he was meeting, was confrontational, and acted like he had something to hide in his vehicle. When Camp exited the vehicle he locked it with his keyless remote, even though the driver's window was partially rolled down, and he said that when Deputy Ferguson was walking him to his patrol car he told Deputy Ferguson that he had thrown his keys into some bushes or that he had lost them. All this was compounded by the fact that Deputy Ferguson was also having difficulty communicating with his dispatcher.
While we have held that nervousness alone may not be sufficient to constitute reasonable suspicion, see State v. Washington, 623 So.2d 392 (Ala.Crim.App.1993), it is a "pertinent factor." As one court stated:
"`Extreme nervousness has traditionally been a fact that law enforcement has used in its list of elements leading up to either reasonable suspicion or probable cause.' Veal [v. State], 28 S.W.3d [832] 837 [(Tex.App.2000)] (citing [United States v.] Sokolow, 490 U.S. [1] 3, 109 S.Ct. [1581] 1583 [(1989)]). `[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion.' Illinois v. Wardlow, 528 U.S. 119, 124, 120 S.Ct. 673, 676, 145 L.Ed.2d 570 (2000)."
Haas v. State, 172 S.W.3d 42, 54 n. 7 (Tex.App.2005).
In Owen v. State, 726 So.2d 745, 747-48 (Ala.Crim.App.1998), we found that nervousness plus evasiveness was sufficient to constitute reasonable suspicion. We stated:
"Unlike [State v.] Washington, [623 So.2d 392 (Ala.Crim.App.1993),] the appellant was not only nervous, but was also evasive. We have previously held that evasive words and behavior can form the basis for reasonable suspicion to conduct a search. Childress v. State, 455 So.2d 175, 177 (Ala.Cr.App.1984); *1147 Key v. State, 566 So.2d 251, 253 (Ala.Cr. App.1990)."
726 So.2d at 747-48.[2]
Based on the totality of the circumstances presented in this case, we hold that Deputy Ferguson had reasonable suspicion to believe that illegal drugs or a weapon may have been in Camp's vehicle and that it was not unreasonable for Deputy Ferguson to prolong the stop so that he could secure Camp in his patrol car and look into the windows of Camp's vehicle. "The facts of this case after the initial stop present a good example of flexible police action escalating in response to the reactions of suspects." State v. Watson, 165 Conn. 577, 586, 345 A.2d 532, 538 (1973). We recognize that situations such as this one are inherently dangerous to law-enforcement officers and that officers must have the flexibility to take measures to ensure their safety.[3]
For the forgoing reasons, we hold that the circuit court properly denied Camp's motion to suppress the evidence found in his vehicle. Accordingly, Camp's convictions are due to be affirmed.
AFFIRMED.
BASCHAB, P.J., and McMILLAN, SHAW, and WISE, JJ., concur; WELCH, J., dissents, with opinion.
WELCH, Judge, dissenting.
For the reasons set forth below, I respectfully dissent.
Alan Thomas Camp was indicted for the unlawful possession of a controlled substance, methamphetamine, a violation of § 13A-12-212, Ala.Code 1975, and for the unlawful possession of drug paraphernalia, a violation of § 13A-12-260, Ala.Code 1975. He filed a motion to suppress the evidence that resulted in his arrest, which was discovered in his vehicle, arguing that the evidence was obtained as a result of an illegal search and seizure. After a hearing, the circuit court denied Camp's motion.
Camp then entered a plea of guilty to each offense. He was sentenced to three years' imprisonment for his conviction on the charge of unlawful possession for methamphetamine and to 180 days in the Morgan County jail for his conviction on the charge of unlawful possession of drug paraphernalia, the sentences to run concurrently. The circuit court split the sentence on the methamphetamine charge and required Camp to serve 180 days in the Morgan County jail, to be followed by three years' probation. Camp, a repeat offender, was ordered to pay $2,000 pursuant to the Drug Demand Reduction Assessment Act, $50 to the Crime Victims Compensation Fund, and $100 to the Forensic Sciences Trust Fund. Camp appealed, asserting that the circuit court erred in denying his motion to suppress.
Testimony elicited during the suppression hearing adduced the following:
On August 21, 2004, between 3:00 and 3:30 a.m., Morgan County Sheriff's Deputy Shannon Ferguson noticed a vehicle pulled off the road, parked down a slope beside a bridge in Lacon, Alabama. The rear of *1148 the vehicle was facing the creek and the front was pointing toward the road. Ferguson pulled his patrol car off the road and drove down toward the vehicle "to see the reason why he was  you know, see if he was in trouble, needed any help or see why he was parked down there." (R. 9.) He also turned on the patrol car's spotlights.
Camp was sitting in the vehicle when Ferguson identified himself as a sheriff's deputy and approached. Ferguson said he asked to see both hands, "because [Camp's] hands weren't visible." Ferguson described the encounter as follows:
"He brought up one hand, his left hand. Then I asked to see his other hand. He brought his other hand up and put it back down real quick. The third time I asked him to see both his hands I drew my firearm and told him to stick both hands out the window."
(R. 10.) Camp testified that at first he did not hear Ferguson because Ferguson "wasn't on a PA or anything." (R. 51.) He said when he realized Ferguson was asking for his hands to be visible, he stuck his left hand out of the window and reached with his right hand to get his keys out, adding that "that's when [Ferguson] got very agitated, so I went ahead and stuck my right hand out, also." (R. 51.)
Ferguson then asked Camp for identification. Camp said when he reached for his wallet "[Ferguson] like to have lost it." (R. 52.) Camp said at that point Ferguson told him to give him his Social Security number.
Because Camp "just kept moving, you know, very furiously around in the vehicle" (R. 11), Ferguson was afraid he may have had a weapon, so he had Camp get out of his truck[4] as he checked Camp's identification. Because Ferguson's walkie-talkie was not working at that location, he had to return to his patrol car to do the identification check. The check indicated that Camp had no outstanding warrants and no other basis for giving law-enforcement officials a reason to suspect him of any wrongdoing.
Ferguson admitted that, at that point, he did not believe Camp was trespassing; Camp was not committing any crime; Ferguson did not smell any alcohol or marijuana, nor did he see any type of controlled substance. He also said that, at that point, he was "no longer fearful that there was a weapon." (R. 18.) Ferguson could not recall specifically why he was no longer concerned about whether Camp had a weapon. He said that he usually conducted a pat-down search of subjects, but he did not recall whether he did a pat-down search of Camp. Regardless, at the time Ferguson went back to his patrol car to run Camp's identification, he was satisfied that Camp was either safe and cooperative or that Camp was out of the vehicle and could not get access to a weapon.
When Ferguson ran the identification check on Camp, he learned that Camp was from Hayden, Alabama. He began questioning Camp about what he was doing in Lacon. Camp said he was to meet a friend to go fishing. Ferguson testified that Camp seemed nervous, and he continued to question Camp about details of the purported fishing trip. Camp refused to tell him the name of the friend he was to meet, but said that the friend was coming from Georgia and they were going to fish at Smith Lake. Ferguson thought Lacon was out of the way for someone from Hayden to meet someone from Georgia to go to Smith Lake, and he became suspicious.
Ferguson asked Camp for consent to search his truck, but Camp said no and *1149 locked the vehicle with his keyless remote device. Camp testified that after he had refused to consent to the search of his truck, "at some point [Ferguson] wanted the keys to my truck and I told him that I had thrown them in the bushes or that I had lost them, I'm not sure which." (R. 54.)
During cross-examination, the following discussion took place:
"Q: [DEFENSE COUNSEL] Okay. And let me ask you, what was the purpose of you asking for consent to search the vehicle?
"A: [FERGUSON] Due to his nervous behavior.
"Q: Is that it?
"A: Yeah.
"Q: Okay. Nothing more?
"A: No.
"Q: Okay. And it was not the result of your observance of any contraband, drugs or anything else?
"A: Right.
"Q: Just he was nervous?
"A: Yeah."
(R. 23.)
While he was talking to Camp, Ferguson said, "they" kept trying his radio to determine the status of the stop, but because he and Camp were "down in a hole" (R. 13) his "`walkie' would not get out." The radio in the patrol unit was able to transmit, however. (R. 21.)
Ferguson said he "[n]ever could get no status, so then I asked him to  I detained him, and told him to step in the back of my vehicle, said he was not under arrest." (R. 13.) Ferguson did not say why he wanted to detain Camp at that point.
While he was trying to get Camp to sit in the backseat of the patrol car, Officer Troy Harville of the Falkville Police Department arrived in a patrol car running its lights and sirens because "they was unable to get a status from me." (R. 13.) He said about 15 to 20 minutes had passed between the time he first approached Camp until Harville arrived.
Harville testified that when he arrived, it looked like Camp and Ferguson were "having what I considered a confrontation." (R. 27.) He said he walked down to the car, where Ferguson was trying to get Camp to get in the back of the patrol car. Harville said that "Camp was just saying he didn't want to get in the car." (R. 28.) He thought Camp was acting "real suspicious" and "real nervous" (R. 28), and "gesturing with his arms when he talked" (R. 29), so Harville suggested they put handcuffs on him.
After Harville and Ferguson handcuffed Camp and put him in the back of Ferguson's patrol car, they walked down to Camp's truck to look inside "just to check to see what may or may not be in there." (R. 30.) Using flashlights, the officers looked into the truck, where Harville saw a syringe on the back floorboard. He told Ferguson of his find, and Ferguson, who was standing on the driver's side of the truck, reached in the open window and opened the door. They searched the truck and found the methamphetamine under a stack of papers on the passenger seat. A narcotics officer was called to the scene to confirm that the substance found in the truck was methamphetamine. Camp was arrested at about 6:00 that morning.
The suppression hearing was held outside the presence of the jury; therefore, this Court reviews the evidentiary findings of the trial court at that hearing under the ore tenus standard. Ex parte Jackson, 886 So.2d 155, 159 (Ala.2004).
"Where evidence is presented to the trial court ore tenus in a nonjury case, a presumption of correctness exists as to *1150 the court's conclusions on issues of fact; its determination will not be disturbed unless clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence. Odom v. Hull, 658 So.2d 442 (Ala.1995). However, when the trial court improperly applies the law to the facts, no presumption of correctness exists as to the court's judgment. Ex parte Board of Zoning Adjustment of the City of Mobile, 636 So.2d 415 (Ala.1994).
"[Ex parte Agee], 669 So.2d [102,] at 104 [(Ala.1995)]. `Where the evidence before the trial court was undisputed the ore tenus rule is inapplicable, and [this Court] will sit in judgment on the evidence de novo, indulging no presumption in favor of the trial court's application of the law to those facts."
Jackson, 886 So.2d at 159.
Camp contends that his seizure by Deputy Ferguson exceeded the duration and scope of an investigatory stop. In his brief on appeal, Camp correctly asserts that a traffic stop is a seizure within the meaning of the Fourth Amendment. Stone v. City of Huntsville, 656 So.2d 404 (Ala.Crim.App.1994). "Nevertheless, because a routine traffic stop is a limited form of seizure, it is analogous to an investigative detention, and we have therefore held that a traffic stop will be governed by the standard set forth in Terry v. Ohio, 392 U.S. 1." United States v. Francis, 140 Fed.Appx. 184, 185 (11th Cir.2005). In Terry the United States Supreme Court held that a person is stopped or seized "whenever a police officer accosts an individual and restrains his freedom to walk away." Terry, 392 U.S. at 16, 88 S.Ct. 1868. Although Camp was in a vehicle that was already stopped when Ferguson approached, the Terry analysis still applies. See, e.g., United States v. Beck, 602 F.2d 726 (5th Cir.1979).
In Peters v. State, 859 So.2d 451 (Ala. Crim.App.2003), a case involving the stop of a vehicle for a mere traffic offense, but which resulted in the arrest of the driver for trafficking in marijuana, this Court determined that the detention of the driver exceeded the scope of the traffic stop. In reversing the trial court's order denying Peters's motion to suppress evidence that resulted in his arrest, which was gathered during a search of Peters's vehicle, this Court set forth the parameters of a seizure when police have no evidence of a crime other than the traffic offense that initiated the "stop."
"`Once the traffic offender signs the UTTC [Uniform Traffic Ticket and Citation], the arresting officer is to "forthwith release him from custody." § 32-1-4(a)[, Ala.Code 1975]. The officer may further detain the driver only if he has probable cause to arrest the driver for some other non-traffic offense, see Hawkins v. State, 585 So.2d 154 (Ala.1991), or has a reasonable suspicion of the driver's involvement in some other criminal activity justifying further detention for investigatory purposes under Terry v. Ohio [, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)], see United States v. Tapia, 912 F.2d 1367 (11th Cir.1990).
"`"Reasonable suspicion is a less demanding standard than probable cause." Alabama v. White, 496 U.S. 325 (1990). However, reasonable suspicion exists only if the officer has "specific, particularized, and articulable reasons indicating that the person [stopped] may be involved in criminal activity," Hickman v. State, 548 So.2d 1077, 1080 (Ala.Crim.App.1989). "To determine whether reasonable suspicion existed for a particular stop, the totality of the circumstances, as known to the officer at the inception of the stop, [or, in this case, at the *1151 time of the continued detention,] must be considered." Arnold v. State, 601 So.2d 145, 149 (Ala.Crim.App.1992) (emphasis added [in Washington]). Accord Lamar v. State, 578 So.2d 1382, 1385 (Ala.Crim.App.), cert. denied, 596 So.2d 659 (1991).' "State v. Washington, 623 So.2d 392, 395-96 (Ala.Crim.App.1993)."
Peters, 859 So.2d at 453-54 (bracketed language added in Washington).
As discussed above, Camp concedes that Ferguson's initial actions in investigating whether the driver of the vehicle needed assistance were appropriate. Ferguson testified that Camp was not trespassing and that there was no other indication of criminal activity when he made his initial investigation. As in Peters, the issue here is whether Ferguson had the necessary reasonable suspicion to detain Camp.
Ferguson testified that, once he got Camp to get out of the vehicle, he was no longer fearful that Camp had a weapon. After running Camp's identification, Ferguson knew there were no outstanding warrants and that police were not looking for him for any reason. There was no evidence that there had recently been a crime committed in the area. Ferguson said he did not see any evidence of a crime in progress. He did not smell alcohol or marijuana. At this point, Camp's detention should have ended, and he should have been free to go on his way. Nonetheless, even after making all these determinations, Ferguson still sought to make Camp sit in the back of the patrol car. Upon Harville's arrival, Camp was handcuffed and made to sit in the back of the police vehicle.
At the suppression hearing, Ferguson and Harville said they detained Camp out of concern for their safety. However, Ferguson had stated that by the time Harville arrived at the scene, he was no longer fearful that Camp had a weapon.
The only articulated reason given at the hearing as to why the law-enforcement officers decided to search Camp's truck was that Camp appeared to be "nervous." The majority view, and the view stated favorably by this Court in State v. Washington, 623 So.2d 392, 398 (Ala.Crim.App. 1993), is that "unless coupled with additional and objectively suspicious factors, nervousness in the presence of a police officer and/or failure to make eye contact do not establish reasonable suspicion to believe that the person is engaged in criminal activity."
Ferguson stated that Camp had not agreed to a consensual search of his vehicle. But a defendant's ultimate refusal to consent to a search of his vehicle cannot be considered as a factor in the officer's determination of reasonable suspicion. Washington, 623 So.2d at 397. We note that even after Camp's refusal to give consent to the search, Ferguson "at some point" asked for the keys to the truck. Camp avoided giving Ferguson the keys by telling him he had thrown them in the bushes or that he had lost them. It is unclear from the record whether Camp had actually thrown the keys in the bushes.
I empathize with the situation Ferguson found himself in when he investigated the vehicle parked by a bridge in the early hours of the morning, with a walkie-talkie that was unable to broadcast out of the area. As I stated above, his actions were appropriate up until the time he had completed the purpose of his investigation and identified Camp. However, there is no evidence in the record to indicate that there was a valid, legal reason to detain Camp once Ferguson had accomplished his initial purpose in investigating the vehicle, identifying Camp, and determining there were *1152 no warrants or other reason that Camp would be wanted by the police.
Ferguson and Harville gave no specific, particularized, and articulable reason to indicate that Camp may have been involved in criminal activity. In fact, Ferguson's testimony is unequivocal that he saw no evidence of criminal activity or contraband and that he had no reason to believe that Camp had been involved in any illegal activity. Thus, there was no reasonable suspicion upon which to base further detention of Camp or the search of his vehicle. Instead of being made to sit in the back of Ferguson's patrol car, Camp should have been free to go. See, Peters, supra and Washington, supra.
Accordingly, the evidence gathered during the search of Camp's car was the result of an illegal search and seizure. Because I would reverse the judgment of the trial court for that reason, I must respectfully dissent.
NOTES
[1] "Our cases make it clear that a seizure does not occur simply because a police officer approaches an individual and asks a few questions." Florida v. Bostick, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). "Similarly, a number of other jurisdictions have held that there is no `seizure of persons' when an officer walks up to a person seated in a parked vehicle in a public place and asks a question of that person." Bentley v. State, 846 N.E.2d 300, 306 (Ind.Ct.App.2006).
[2] "[T]he Kansas Supreme Court has recognized that the location, time of day, previous reports of crime in the area, and furtive actions of suspects may well justify a stop." State v. Kirby, 12 Kan.App.2d 346, 353, 744 P.2d 146, 151 (1987).
[3] "According to one study, approximately 30% of police shootings occurred when a police officer approached a suspect seated in an automobile. Bristow, Police Officer Shootings-A Tactical Evaluation. 54 J Crim LC & PS 93 (1963)." Adams v. Williams, 407 U.S. 143, 148 n. 3, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).
[4] The record does not indicate the type of truck Camp was driving.