On Application for Rehearing
 

 KELLUM, Judge.
 

 The opinion released on July 30, 2010, is withdrawn and the following opinion is substituted therefor.
 

 Dandre Shamar Jemison was arrested and charged with one count of unlawful possession of a controlled substance — N-Benzylpiperazine — a violation of § 13A-12-212, Ala.Code 1975, and one count of driving while his license was suspended, a violation of § 32-6-19, Ala.Code 1975. Je-mison filed a motion to suppress the package of “Ecstasy”
 
 [1]
 
 pills recovered by police during what Jemison alleged was an illegal detention and search. Following an evi-dentiary hearing, the circuit court granted Jemison’s motion to suppress. Pursuant to Rule 15.7, Ala. R.Crim. P., the State appeals the circuit court’s ruling.
 

 
 *836
 
 The State presented the following evidence at the suppression hearing. On October 12, 2008, Clanton Police Officer David Clackley was patrolling the Second Avenue and Martin Luther King, Jr. Street area of Clanton to watch a residence reportedly involved in drug activity. Officer Clackley drove away from the area for a short period, and when he returned he saw a vehicle, later determined to be being driven by Jemison, drive away from the residence. Officer Clackley followed the vehicle approximately four blocks “just to see what the situation was and check on the status of the driver and see if there were any violations to make a traffic stop.” (R. 7.) Officer Clackley observed “a DVD player or some type of in-dash screen” in Jemison’s car, recorded Jemison’s license-plate number, and called in the license-plate number to a police dispatcher. According to Officer Clackley, he was about to initiate a traffic stop as the vehicle approached the end of the street and appeared to prepare to be making a right turn; however, Jemison abruptly pulled forward into the driveway of a house across the street, which it was later revealed belonged to Jemison’s uncle, and “bumped” a vehicle parked in the driveway in the process. Again, Officer Clackley did not initiate a traffic stop, but instead made a right turn and stopped his vehicle approximately 30 feet from the front door of the house. Officer Clackley testified that he believed Jemison pulled into the driveway because he knew a police vehicle was driving behind him; Officer Clackley wanted to “see if in fact that was [Jami-son’s] residence or whoever came to the door allowed him to come in or turn him away.” (R. 9.)
 

 Jemison got out of the car, approached the front door of the house, and began looking in his pocket as if he were trying to locate a key. After a few moments, Jemison looked back over his shoulder at Officer Clackley and began walking toward the rear of the house. Office Clackley explained:
 

 “At this time, I didn’t know if it was actually his house, whose house it was, or if any criminal acts had occurred prior to me getting there.
 

 [[Image here]]
 

 “I rolled my window down and I said, ‘Hey, man, do you live here? Can I talk to you for a second,’ to confirm that he lived there, make sure he wasn’t drunk or whatever the case may be, make sure he wasn’t fixing to break into the house, which is a possibility. And when I said that, he got real nervous and he picked up his pace. As he was walking he said, ‘Man, I got to go.’ I said, ‘I need to talk to you for a second and make sure you live here.’ He said, ‘Man, I got to go,’ and he took off running around the back of the house.”
 

 (R. 11.) Officer Clackley ran after Jemi-son and caught up with him approximately four or five blocks from the house, then placed him in custody. By this time, another officer had arrived on scene and transported Jemison back to Jemison’s vehicle so that Officer Clackley could retrace the steps of Jemison’s flight. Officer Clackley explained that he retraced Jemi-son’s steps because
 

 “[a]t this point, I wasn’t exactly sure what [Jemison’s] reason for running was. I knew he ran. I’ve been a police officer for ten years. I know that people don’t just run to be running. I wanted to go back, backtrack where we had ran. I started from where I caught him and check the area to see if there [was] any evidence [Jemison] disposed of, whether it be a gun, evidence of a burglary, a robbery, drugs, whatever.”
 

 (R. 12.) While he was retracing their steps, Officer Clackley found a small plastic bag filled with small, different colored pills around the corner of the house ap
 
 *837
 
 proximately 20 feet from Jemison’s vehicle. Officer Clackley testified that although he did not see Jemison drop the bag of pills, the bag of pills was recovered along the route Jemison ran as he ran from the officer. The pills were later field-tested by the Department of Forensic Sciences and were determined to be Ecstasy, a controlled substance. Officer Clackley proceeded to search Jemison’s vehicle, in which he found approximately $9,000 in cash.
 

 During the direct examination of Officer Clackley, the trial court questioned him about why he arrested Jemison. Officer Clackley explained that he arrested Jemi-son because he believed that Jemison’s flight down the center of a public street constituted disorderly conduct, specifically, “under the subsection of blocking or interrupting a pedestrian or vehicle or traffic in a public highway.” (R. 18.) Furthermore, Officer Clackley stated he wanted to determine “what, if any, criminal activity [Jemi-son] had partaken in prior to running from [Officer Clackley]” and “why exactly [Je-mison] did run.” (R. 18, 19.) When asked by the State if he would have continued with his investigatory stop even if he did not charge Jemison with disorderly conduct, Officer Clackley said, “Oh, yes, definitely. Could have been a stolen vehicle, could have just performed a robbery. Really I had no idea when he initially ran why exactly he was running.” (R. 20.) Officer Clackley admitted that when he initiated contact with Jemison, he believed Jemison “had committed, was committing, or was about to commit” some offense. (R. 21.)
 

 When asked on cross-examination whether he stopped Jemison to investigate Jemison’s vehicle bumping the other vehicle parked in the driveway into which Je-mison pulled his car, Officer Clackley explained:
 

 “The whole situation led me to believe that something was going on with him, whether he had been drunk, stolen vehicle, just committed domestic violence. I really had no clue as to what was going on. The bumping into the other vehicle was a major indicator to me something was going on in this situation.”
 

 (R. 22.) Officer Clackley admitted that he did not reference the bumping of the parked vehicle in his incident report but explained that he did not do so because neither car was damaged. In asking for clarification regarding why Officer Clack-ley initiated contact with Jemison, Officer Clackley and defense counsel had the following exchange:
 

 “[Defense counsel]: So tell me now, because I’m confused, what was the original basis upon which you had to initiate contact with my client? What was your reasoning?
 

 “[Officer Clackley]: Like I said, it wasn’t a traffic stop. I simply asked him if I could speak with him. I never commanded him to stop and talk to me. When I asked, ‘Hey, man, can I talk to you a minute,’ he fled. In my experience, when people run from me upon a simple question—
 

 “[Defense counsel]: You never ordered him to stop and talk to you?
 

 “[Officer Clackley]: Once when we got on Taylor Avenue is when I started giving commands.
 

 “[Defense counsel]: I’m trying to understand the disorderly conduct. If you had not instructed him that he had to stay there and talk with you and if there was no custodial situation, what was the basis upon your chase of him at this point?
 

 “[Officer Clackley]: I have as much a right to run as he does. Once I observed him running in the highway, then he was violating the section that I
 
 *838
 
 charged him with, which was disorderly conduct. Up to that point we were both just going for a run.
 

 “[Defense counsel]: Up to that point, you were just going for a run?
 

 “[Officer Clackley]: Yes, ma’am. I was observing him.”
 

 (R. 24-25.)
 

 On December 16, 2009, the trial court granted Jemison’s motion to suppress without explanation. This appeal ensued.
 

 In
 
 State v. Landrum,
 
 18 So.3d 424 (Ala.Crim.App.2009), this Court explained:
 

 “ ‘This Court reviews de novo a circuit court’s decision on a motion to suppress evidence when the facts are not in dispute.
 
 See State v. Hill,
 
 690 So.2d 1201, 1203 (Ala.1996);
 
 State v. Otwell,
 
 733 So.2d 950, 952 (Ala.Crim.App.1999).’
 
 State v. Skaggs,
 
 90S So.2d 180, 181 (Ala.Crim.App.2004). In State
 
 v. Hill,
 
 690 So.2d 1201 (Ala.1996), the trial court granted a motion to suppress following a hearing at which it heard only the testimony of one police officer. Regarding the applicable standard of review, the Alabama Supreme Court stated, in pertinent part, as follows:
 

 “ ‘ “Where the evidence before the trial court was undisputed the ore tenus rule is inapplicable, and the Supreme Court will sit in judgment on the evidence de novo, indulging no presumption in favor of the trial court’s application of the law to those facts.”
 
 Stiles v. Brown,
 
 380 So.2d 792, 794 (Ala.1980) (citations omitted). The trial judge’s ruling in this case was based upon his interpretation of the term “reasonable suspicion” as applied to an undisputed set of facts; the proper interpretation is a question of law.’
 

 “State v. Hill,
 
 690 So.2d at 1203-04.”
 

 18 So.3d at 426. Because the evidence presented at the suppression hearing is not in dispute, the only issue before this Court is whether the circuit court correctly applied the law to the facts presented at the suppression hearing, and we afford no presumption in favor of the circuit court’s ruling.
 

 Initially, we note that the circuit court offered no explanation in granting Jemi-son’s motion to suppress. In his motion to suppress, and again on appeal, Jemison argued that both the seizure of his person and the searches that yielded the bag of Ecstasy and the money in his vehicle violated his Fourth Amendment rights
 

 I.
 

 The State contends that the circuit court erred in granting Jemison’s motion to suppress because, it says, Officer Clackley in no way “unlawfully or illegally seize[d]” Jemison. (State’s brief, at 15.) However, Jemison argues that the circuit court properly suppressed the evidence seized in this case and directs this Court’s attention to “five points at which the individual constitutional rights and freedoms of Jemison intersect with the authority granted to law enforcement” that he says show an “overall unconstitutional and unreasonable encounter.” (Jemison’s brief, at 12, 32.) The first four points listed by Jemison relate to the facts leading up to Jemison’s arrest by Officer Clackley and question the legality of the seizure; the fifth point relates to the search of the yard in which the drugs were found and the search of Jemi-son’s car after his arrest.
 

 In
 
 Terry v. Ohio,
 
 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the United States Supreme Court explained:
 

 “The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particu
 
 *839
 
 lar search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard:
 
 would the facts available to the officer at the moment of the seizure or the search ‘warrant a man of reasonable caution in the belief that the action taken was appropriate ?
 
 ”
 

 392 U.S. at 22 (emphasis added). Additionally, in
 
 State v. Green,
 
 992 So.2d 82 (Ala.Crim.App.2008), this Court stated:
 

 “The United States Supreme Court in
 
 United States v. Sokolow,
 
 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), stated:
 

 “ ‘The Fourth Amendment requires “some minimal level of objective justification” for making the stop.
 
 INS v. Delgado,
 
 466 U.S. 210, 217 (1984). That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence. We have held that probable cause means “a fair probability that contraband or evidence of a crime will be found,”
 
 Illinois v. Gates,
 
 462 U.S. 213, 238 (1983), and the level of suspicion required for a
 
 Terry
 
 stop is obviously less demanding than that for probable cause, see
 
 United States v. Montoya de Hernandez,
 
 473 U.S. 531, 541, 544 (1985).’ ”
 

 992 So.2d at 84.
 

 Throughout his brief, Jemison highlights alleged inconsistencies and “holes” in Officer Clackley’s testimony in support of his contention that Officer Clackley failed to articulate a reasonable, objective basis for pursuing and ultimately detaining Jemison. In his fourth point, in which he challenges Officer Clackley’s eventual arrest of Jemison for disorderly conduct, Jemison alleges that the charge of disorderly conduct was “an afterthought.” (Jemison’s brief, at 21.) To the extent that Jemison contends that his stop and detention were pretextual and thus unconstitutional, we note that “[a]s long as the police officer is doing only what is objectively authorized and legally permitted, the officer’s subjective intent in doing it is irrelevant.”
 
 Ex parte Scarbrough,
 
 621 So.2d 1006, 1010 (Ala.1993). Thus, we will not speculate as to Officer Clackley’s subjective intentions but will focus only on the reasonableness of his actions with respeGt to the objective factors observed over the course of the interaction between Officer Clackley and Jemison.
 

 Finally, at the heart of Jemison’s various claims of Fourth Amendment infringement lies the argument that Officer Clackley’s targeting, pursuit, and eventual detention of Jemison were not based upon sufficient reasonable suspicion or probable cause but were based upon Officer Clackley’s “curiosity and broad range of suspicions unsupported by objective justifications.” (Jemi-son’s brief, at 45.) According to Jemison, the facts of this case could not have created within Officer Clackley the reasonable suspicion or probable cause necessary to conduct a lawful detention that comports with the requirements of the Fourth Amendment.
 

 As we proceed through the events that culminated in Jemison’s arrest, we will continue to revert to the most pertinent inquiry a reviewing court must ask in analyzing the constitutionality of a police seizure: “[Wjould the facts available to the officer at the moment of the seizure or the search Warrant a man of reasonable caution in the belief that the action taken was appropriate?”
 
 Terry,
 
 392 U.S. at 22. With this “man of reasonable caution” standard in mind, we turn to the events that culminated in Jemison’s arrest.
 

 A.
 

 Officer Clackley initially became interested in Jemison because he saw Jemi-
 
 *840
 
 son drive away from a house with a reputation for drug activity. This Court has recognized that the association of a suspect with a facility known or suspected of drug activity is a factor that may give rise to reasonable suspicion or probable cause.
 
 See Ex parte Kelley,
 
 870 So.2d 711, 725 (Ala.2003) (officer’s background knowledge concerning the association of a facility with narcotics dealing was “legitimately included in his calculus of probable cause”). Thus, observing Jemison driving away from a house where drug activity was suspected, Officer Clackley decided to follow and watch Jemison; that decision was justified and reasonable.
 

 Jemison attacks this factor within his first of his aforementioned five instances of infringement of Jemison’s Fourth Amendment rights. Here, Jemison relies on
 
 B.J.C. v. State,
 
 992 So.2d 90 (Ala.Crim.App.2008), in arguing that whatever tip the police received regarding the drug activity at the house Officer Clackley was watching lacked the “indicia of reliability critical to allow the officer to infringe on the Fourth Amendment rights of Jemison.” (Jemison’s brief, at 12.) In
 
 B.J.C.,
 
 this Court held that a
 
 Terry
 
 stop was constitutionally impermissible pursuant to
 
 Florida v. J.L.,
 
 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), when the initial detention was based solely upon an anonymous tip and the tip lacked any “ ‘indicia of reliability as of the kind as contemplated in
 
 [Adams v. Williams,
 
 407 U.S. 143 (1972),] and
 
 [Alabama v. White,
 
 496 U.S. 325 (1990).]’”
 
 B.J.C.,
 
 992 So.2d at 94, quoting
 
 J.L.,
 
 529 U.S. at 274. At this point, Officer Clack-ley did not detain Jemison, nor did he ultimately detain Jemison based upon this tip alone; thus, the holding of
 
 B.J.C.
 
 has no bearing on this case. Accordingly, Je-mison’s first allegation of a constitutional infringement by Officer Clackley is merit-less.
 

 B.
 

 Next, we consider Officer Clackley’s observations regarding Jemison’s driving. Officer Clackley testified that he followed Jemison for approximately a quarter of a mile. As Jemison approached the end of the street, Officer Clackley explained that it appeared as if Jemison was going to make a right turn; instead, Jemison abruptly drove forward into a residential driveway, bumping a parked vehicle in the process. Officer Clackley believed that Jemison knew that Officer Clackley was following him. This Court has recognized that erratic or evasive driving is a factor that can be considered when determining whether an officer has reasonable suspicion.
 
 See Martin v. State,
 
 529 So.2d 1032 (Ala.Crim.App.1988). After bumping the parked car, Jemison approached the house, knocked on the front door, looked over his shoulder at Officer Clackley, and began walking toward the rear of the house. At this point, Officer Clackley called out to Jemison to determine what Jemison was doing. Officer Clackley asked Jemison if he lived there, and he said that Jemison “got real nervous,” “picked up his pace,” and told Officer Clackley that he “had to go.” (R. 11.) Officer Clackley told Jemison that he needed to talk to him to “make sure you live here,” and Jemison again said he “had to go,” and then “took off running.” (R. 11.) This Court has repeatedly held that “ ‘nervous, evasive behavior is a pertinent factor in determining reasonable suspicion.’ ”
 
 State v. McPherson,
 
 892 So.2d 448, 454 (Ala.Crim.App.2004), quoting
 
 Illinois v. Wardlow,
 
 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000).
 
 See also Smith v. State,
 
 19 So.3d 912 (Ala.Crim.App.2009);
 
 W.D.H. v. State,
 
 16 So.3d 121 (Ala.Crim.App.2008); and
 
 Camp v. State,
 
 983 So.2d 1141 (Ala.Crim.App.2007) (all quoting
 
 Wardlow
 
 to support the same proposition). Because Jemison’s erratic
 
 *841
 
 driving, nervousness, and evasive behavior were all suspicious actions, Officer Clack-ley acted reasonably in continuing to investigate.
 

 C.
 

 According to Officer Clackley, after Jemison told him a second time that he had to go, Jemison took off in headlong flight away from Officer Clackley. In
 
 Wardlow,
 
 the United States Supreme Court observed that “[hjeadlong flight— wherever it occurs — is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is clearly suggestive of such.” 528 U.S. at 124-25. In Jemison’s third allegation he contends that he was well within his rights to “leave” after answering Officer Clackley’s questions. (Jemison’s brief, at 19.) Jemison relies upon
 
 Florida v. Royer,
 
 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), to justify his “picking up his pace” while leaving because, he says, he was free “to go on his way.” (Jemison’s brief, at 20.) As best we can understand, Jemison appears to argue that his exercising his right to terminate the interaction should in no way be considered suspicious or in no way would have justified a stop by Officer Clackley. However, the United States Supreme Court in
 
 Wardlow
 
 recognized that its holding was consistent with
 
 Royer
 
 in that “[fjlight, by its very nature, is not ‘going about one’s business’; in fact, it is just the opposite.” 528 U.S. at 125. Contrary to his assertion, Jemison’s decision to run from Officer Clackley was not akin to Jemison’s declining to answer questions and go on about his way. Jemison took off in headlong flight away from Officer Clackley, an action that would have, taking into consideration all the circumstances attendant to the situation, given Officer Clackley a reasonable suspicion that criminal activity was afoot. Accordingly, Jemison’s headlong flight away from Officer Clackley suggested that he was involved with some sort of criminal activity; thus, Officer Clackley was justified in pursuing Jemison to investigate further.
 

 Throughout his first three allegations of constitutional violations, Jemison repeatedly contends that Officer Clackley’s purportedly inconsistent testimony evidenced no reasonable basis for him to stop Jemison. Specifically, within Jemison’s second allegation, he contends that Officer Clackley’s various justifications for following and ultimately stopping Jemison evidenced a lack of a reasonable basis to initiate a stop. However, in the situations described in Jemison’s first three points, no detention had taken place. Officer Clackley testified that he was approximately 30 feet away from Jemison when he began asking Jemison questions at the residence. Up until the moment Officer Clackley caught up with a fleeing Jemison and arrested him, Officer Clackley had not stopped or detained, and thus had not seized, Jemison in any meaningful sense. A Fourth Amendment seizure takes place only “when there is a governmental termination of freedom of movement through intentionally applied means.”
 
 Brower v. County of Inyo,
 
 489 U.S. 593, 597, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989). Thus, Officer Clackley did not seize Jemison by following him in his police vehicle,
 
 see Brower
 
 (the show of police authority inherent in a police chase does not, in and of itself and without actually causing a traffic stop, constitute a seizure under the Fourth Amendment); by speaking to him and attempting to ask questions,
 
 see Royer,
 
 460 U.S. at 497 (“law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions”); or by
 
 *842
 
 giving chase to Jemison once he fled the scene.
 
 See California v. Hodari D.,
 
 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) (a police officer running after a suspect and ordering him to halt does not seize the suspect when the suspect refuses to comply with the officer’s orders and continues fleeing). Because up until the point of actual arrest Officer Clackley had not seized Jemison under any standard articulated by the United States Supreme Court, no Fourth Amendment violation took place during the events proceeding the actual arrest. Accordingly, no claim raised within Jemison’s first three claims of Fourth Amendment infringement entitles him to relief.
 

 D.
 

 Officer Clackley finally apprehended Jemison after giving chase for approximately four or five blocks. Officer Clackley handcuffed Jemison and placed him under arrest for disorderly conduct, specifically “under the subsection of blocking or interrupting a pedestrian or vehicle traffic in a public highway.” (R. 18.) In his fourth point, Jemison argues that his arrest was unconstitutional because, he says, Officer Clackley did not have the requisite reasonable suspicion or probable cause to arrest him. Specifically, Jemison contends that Officer Clackley’s testimony regarding disorderly conduct was “an afterthought.” (Jemison’s brief, at 21.) Moreover, Jemison also argues that the State failed to prove a prima facie case of disorderly conduct.
 

 Section 13A-ll-7(a)(5), Ala.Code 1975, states that a person commits the crime of disorderly conduct if, “with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he ... [o]bstructs vehicular or pedestrian traffic.” Additionally, § 15 — 10—8(a)(1), Ala.Code 1975, states, in pertinent part: “An officer may arrest a person without a warrant, on any day and at any time ... [i]f a public offense has been committed or a breach of the peace threatened in the presence of a police officer.”
 

 In
 
 Powell v. State,
 
 796 So.2d 404 (Ala.Crim.App.1999), aff'd, 796 So.2d 434 (Ala.2001), this Court stated:
 

 “ ‘The level of evidence needed for a finding of probable cause is low. “An officer need not have enough evidence or information to support a conviction [in order to have probable cause for arrest].... ‘[0]nly the probability, and not a prima facie showing, of criminal activity is the standard of probable cause.’ ”
 
 Stone v. State,
 
 501 So.2d 562, 565 (Ala.Cr.App.1986). “ ‘Probable cause exists where “the facts and circumstances within [the arresting officers’] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that” an offense has been or is being committed.’ ”
 
 Young v. State,
 
 372 So.2d 409, 410 (Ala.Cr.App.1979) (quoting
 
 Draper v. United States,
 
 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1959)).’ ”
 

 796 So.2d at 424, quoting
 
 State v. Johnson,
 
 682 So.2d 385, 387-88 (Ala.1996).
 

 According to Officer Clackley, Jemison ran through the yards of houses in that neighborhood and in the center of Taylor Avenue before finally being apprehended four or five blocks away. Officer Clackley witnessed these events as he gave chase and eventually caught Jemison. These observations were sufficient to give Officer Clackley sufficient probable cause to arrest Jemison. Contrary to Jemison’s argument on appeal, the State was not required to present evidence sufficient to sustain a conviction for disorderly conduct in order to render the warrantless arrest
 
 *843
 
 lawful. Accordingly, Officer Clackley’s warrantless arrest of Jemison was lawful.
 

 On a daily basis, police officers are required to use their training and experiences to investigate crimes and to apprehend those suspected of wrongdoing. In many cases, including this one, seemingly innocent or otherwise noncriminal activities may catch the attention of a police officer and spark within that officer a belief that further investigation is required. In these instances, reviewing courts are called to be careful and defer to the judgment of the police officers.
 
 See, Williams v. State,
 
 716 So.2d 758, 756 (Ala.Crim.App.1998) (“When reviewing the degree of suspicion that attaches to noncriminal behavior, courts should give great deference to the training and experience of police officers.”). Courts reviewing interactions between police and potential criminals have repeatedly instructed that such interactions cannot be viewed in a vacuum, but must be analyzed considering the “totality of the circumstances.” In asking if a reasonable man standing at the same vantage point as Officer Claekley, witnessing the same behavior of a suspect, would believe that Officer Clackley’s pursuit and seizure of Jemison were appropriate, we answer that inquiry in the affirmative.
 

 Officer Claekley never seized Jemison under the plain meaning of the Fourth Amendment before he placed Jemison under custodial arrest. Furthermore, Officer Clackley’s arrest of Jemison was lawful. Based on the foregoing, we conclude that Jemison was never subjected to an illegal seizure during the course of his interaction with Officer Claekley. Thus, we now turn to the search that uncovered the Ecstasy underlying this prosecution.
 

 II.
 

 The State argues that no illegal search took place in this case. Specifically, the State contends that the bag of Ecstasy was not found pursuant to any sort of search but was recovered on the ground along the route of Jemison’s flight. Furthermore, the State contends, even if the recovery of the bag of Ecstasy could be construed to be the result of a search, the search in no way involved an area in which Jemison had a reasonable expectation of privacy. Jemison contends that the State failed to show “exigent circumstances or an applicable exception [to the warrant requirement]” in order to conduct a warrantless search of Jemison’s uncle’s yard.
 

 “‘In the context of the Fourth Amendment, a search implies probing into secret places for that which is hidden [and] implies force, actual or constructive, or a forceable dispossession of property of one by exploratory acts.’ ”
 
 Williams v. State,
 
 3 So.3d 285, 289 (Ala.Crim.App.2008), quoting
 
 Vogel v. State,
 
 426 So.2d 863, 872 (Ala.Crim.App.1980) (internal citations omitted).
 

 Here, the actions taken by Officer Claekley do not fit within the parameters of a “search” as described by this Court in
 
 Williams.
 
 The bag of Ecstasy was found along Jemison’s flight route close to the corner of the house on a pile of leaves adjacent to the driveway. In no way could Officer Clackley’s actions be described as “probing” or “exploratory.” Accordingly, no search falling within the meaning of the Fourth Amendment took place.
 

 Moreover, assuming, for the sake of argument, that Officer Clackley’s recovery of the bag of Ecstasy did constitute a search, Jemison lacks standing to challenge the search of his uncle’s yard. In
 
 Jones v. State,
 
 946 So.2d 903 (Ala.Crim.App.2006), this Court explained:
 

 “ ‘An appellant wishing to establish standing to challenge the introduction of evidence obtained as a result of an
 
 *844
 
 alleged violation of the Fourth Amendment must demonstrate that he has a legitimate expectation of privacy in the area searched.
 
 Cochran v. State,
 
 500 So.2d 1161 (Ala.Cr.App.1984), rev’d in part on other grounds, 500 So.2d 1179 (Ala.1985), on remand, 500 So.2d 1188 (Ala.Cr.App.1986), aff'd, 500 So.2d 1064 (Ala.1986), cert. denied, 481 U.S. 1033, 107 S.Ct. 1965, 95 L.Ed.2d 537 (1987). . . . “A person who is aggrieved by an illegal search and seizure
 
 only through the introduction of damaging evidence secured by a search of a third person’s premises or property has not had any of his Fourth Amendment rights infringed.” Rakas v. Illinois,
 
 439 U.S. 128, 134, 99 S.Ct. 421, 425, 58 L.Ed.2d 387 (1978). “For a search to violate the rights of a specific defendant, that defendant must have a legitimate expectation of privacy in the place searched, and the burden is squarely on the defendant asserting the violation to establish that such an expectation existed.”
 
 Kaercher v. State,
 
 554 So.2d 1143, 1148 (Ala.Cr.App.), cert. denied, 554 So.2d 1152 (Ala.1989).’
 

 “Harris v. State,
 
 594 So.2d 725, 727 (Ala.Crim.App.1991).”
 

 946 So.2d at 919-20 (emphasis added). The record is devoid of any evidence indicating that Jemison had a legitimate expectation of privacy in his uncle’s yard. Jemison offers no argument otherwise. Accordingly, Jemison did not have standing to challenge the search of his uncle’s yard.
 

 Finally, Jemison argues that the trial court properly suppressed the bag of Ecstasy recovered from the scene on the ground that Officer Clackley did not see Jemison throw the bag on the ground during the chase. Officer Clackley admitted during the suppression hearing that he did not see Jemison abandon anything as he was fleeing from the scene. To the extent that the trial court suppressed the bag of Ecstasy on the ground that Officer Clack-ley did not actually see Jemison in possession of the drugs before he discarded them, we hold that such a consideration is an improper justification for suppressing this evidence.
 

 A suppression hearing serves as a means through which a party may challenge the admission of evidence purportedly obtained through an illegal seizure or search.
 
 See
 
 Rule 15.6(a), Ala.R.Crim. P. (“A defendant aggrieved by an allegedly unlawful search or seizure may move the court to suppress for use as evidence anything so obtained.”). In a case like the one at hand, where the defendant moves to suppress evidence on the ground that the evidence was obtained in violation of the Fourth Amendment, the inquiry begins and ends with the questions regarding the constitutionality of the search and/or seizure: if the search and/or seizure was unconstitutional, the motion is due to be granted and the evidence suppressed; however, if the search and/or seizure was constitutionally permissible, the motion is due to be denied, and the evidence survives Fourth Amendment scrutiny. Any question regarding the weight or veracity of the evidence must be decided by the jury, as this inquiry falls outside the scope of the suppression hearing.
 
 Cf Bryant v. State,
 
 428 So.2d 641, 645 (Ala.Crim.App.1982) (“The purpose of a suppression hearing is to determine the
 
 voluntariness
 
 of a statement, not its content.”).
 

 By analogy, this Court has recognized that Rule 13.5(c)(1), Ala.R.Crim. P., does not authorize “a trial court to dismiss an indictment based on the court’s pretrial determination of the sufficiency of the State’s case.”
 
 State v. Worley,
 
 [Ms. CR-06-1879, November 13, 2009] —
 
 *845
 
 So.3d -, - (Ala.Crim.App.2009). Under Rule 13.5(c)(1), an indictment maybe dismissed only “based upon objections to the venire, the lack of legal qualifications of an individual grand juror, the legal insufficiency of the indictment, or the failure of the indictment to charge an offense.”
 
 Worley,
 
 — So.3d at -, quoting
 
 State v. Foster,
 
 935 So.2d 1216 (Ala.Crim.App.2005), and citing Rule 13.5(c)(1), Ala. R.Crim. P. Thus, whereas Rule 13.5(c)(1) allows for the pretrial dismissal of an indictment only on limited grounds, but not dismissal based upon a pretrial determination of the sufficiency of the State’s evidence, Rule 15.6(a) likewise allows only for the suppression of evidence obtained pursuant to an illegal search or seizure, but does not authorize suppression based upon the trial court’s determination of the sufficiency of the State’s evidence. Accordingly, to the extent the trial court suppressed the evidence of the bag of Ecstasy on the ground that the State failed to prove the existence of a nexus linking Je-mison to the drugs, that suppression was in error because it fell outside the bounds of the motion to suppress.
 

 Finally, we note that in Jemison’s original motion to suppress he claimed that the State failed to prove the chain of custody of the evidence in this case. Apparently, this issue was not contested at the suppression hearing because the only testimony relating to a chain-of-custody claim can be found in Officer Clackley’s statement that he turned over the drugs to the Alabama Department of Forensic Sciences for testing. No other inquiries were made. Accordingly, the record is devoid of evidence indicating suppression was warranted based upon the failure of the State’s chain-of-custody evidence.
 

 Jemison also claims that the suppression of the evidence seized from his vehicle was justified on the ground that Officer Clackley’s search of his vehicle was conducted in violation of
 
 Arizona v. Gant,
 
 556 U.S. 332, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009). Specifically, Jemison contends that the search was illegal under
 
 Gant
 
 on the grounds (1) that the search was not necessary for Officer Clackley’s own safety; and (2) that Officer Clackley could not have reasonably believed that a search of Jemison’s car would have uncovered evidence of the offense on which the arrest was made — disorderly conduct. The State contends that
 
 Gant
 
 should not retroactively apply to Jemison’s case.
 

 This Court has not yet addressed the applicability of
 
 Gant
 
 to cases pending on direct appeal. In the wake of
 
 Gant,
 
 the United States Court of Appeals for the Eleventh Circuit in
 
 United States v. Davis,
 
 598 F.3d 1259 (11th Cir.2010), discussed whether
 
 Gant
 
 applied retroactively to a case then before the court on direct appeal:
 

 “Although the Supreme Court’s retro-activity doctrine has a complicated history,
 
 see United States v. Johnson,
 
 457 U.S. 537, 542-48, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982), it is now settled that ‘a decision of [the Supreme] Court construing the Fourth Amendment is to be applied retroactively to all convictions that were not yet final at the time the decision was rendered,’
 
 id.
 
 at 562, 102 S.Ct. 2579, ‘with no exception for cases in which the new rule constitutes a “clear break” with the past,’
 
 Griffith v. Kentucky,
 
 479 U.S. 314, 328, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987).
 
 [2]
 

 Accord Glazner v. Glazner,
 
 347 F.3d 1212, 1217 (11th Cir.2003) (‘[F]or newly announced rules governing criminal prosecutions, the Supreme Court has completely rejected both pure prospectivity, which occurs where a court gives a newly announced rule no retroactive effect, and modified prospectivity, which occurs where a court applies a newly announced rule retroactively on a case by
 
 *846
 
 case basis.’). Because Davis’s case was pending on direct appeal when
 
 Gant
 
 was decided, the rule announced in that decision applies to his case.
 

 598 F.3d at 1263. Here, Jemison presents his claim on direct appeal from his conviction, and, therefore, his conviction was not yet “final.” Thus, the rule announced in
 
 Gant
 
 applies to Jemison’s case. However, before concluding that the suppression of evidence seized from the vehicle is a proper remedy under
 
 Gant,
 
 we must determine whether (1) Officer Clackley’s action’s violated the rule announced in
 
 Gant,
 
 and, if so, (2) whether the exclusionary rule commands suppression of any evidence seized in violation of
 
 Gant. See Davis,
 
 598 F.3d at 1263, quoting
 
 United States v. Leon,
 
 468 U.S. 897, 906, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), quoting in turn
 
 Illinois v. Gates,
 
 462 U.S. 213, 233, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (“ ‘Whether the exclusionary sanction is appropriately imposed in a particular case ... is “an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct.” ’ ”).
 

 Initially, we question whether Officer Clackley’s search of Jemison’s vehicle violated the rule announced in
 
 Gant.
 
 In
 
 Gant,
 
 the United States Supreme Court reexamined its holding in
 
 New York v. Belton,
 
 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), in which the Court held “that when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile.”
 
 Id.,
 
 at 460.
 
 See also Davis,
 
 598 F.3d at 1259 (“As the Supreme Court later explained, its opinion in
 
 Belton
 
 was “widely understood to allow a vehicle search incident to the arrest of a recent occupant even if there [was] no possibility the arres-tee could gain access to the vehicle at the time of the search.’
 
 Gant,
 
 129 S.Ct. at 1718.”). The Court in
 
 Gant
 
 replaced the rule announced in
 
 Belton
 
 and explained:
 

 “The experience of the 28 years since we decided
 
 Belton
 
 has shown that the generalization underpinning the broad reading of that decision is unfounded. We now know that articles inside the passenger compartment are rarely ‘within “the area into which an arrestee might reach,”’ 453 U.S., at 460, and blind adherence to Belton’s faulty assumption would authorize myriad unconstitutional searches. The doctrine of stare decisis does not require us to approve routine constitutional violations.
 

 [[Image here]]
 

 “Police may search a vehicle incident to a recent occupant’s arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest. When these justifications are absent, a search of an arres-tee’s vehicle will be unreasonable unless police obtain a warrant or show that another exception to the warrant requirement applies.”
 

 556 U.S. at -, 129 S.Ct. at 1723-24.
 

 Here, it is undisputed that Jemison was not within “reaching distance of the passenger compartment” at the time he was arrested by Officer Clackley. Thus, Officer Clackley was not justified in searching Jemison’s vehicle on this ground. However, we believe that Officer Clackley was justified in searching Jemison’s vehicle on the ground that he reasonably believed
 
 *847
 
 that he would find evidence related to the drugs recovered from the scene.
 

 Jemison argues that he was arrested for disorderly conduct and that Officer Clack-ley had no reasonable expectation that he might find evidence of that offense in the vehicle. Jemison’s view of the Supreme Court’s holding in
 
 Gant
 
 is too narrow. Here, it is reasonable to conclude that Officer Clackley had probable cause to suspect that Jemison had committed the offense of disorderly conduct, see Part I of this opinion, and that Jemison had committed some drug-related offense by the time Officer Clackley recovered the Ecstasy in the yard.
 
 See Woods v. State,
 
 695 So.2d 636, 640 (Ala.Crim.App.1996) (“Probable cause exists where all the facts and circumstances within the officer’s knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has been or is being committed and that contraband would be found in the place to be searched.”)(internal citations omitted). Given the totality of the circumstances— Jemison’s suspicious behavior, his flight, and the recovery of the Ecstasy along Jemison’s flight path — Officer Clackley could have reasonably believed that he would uncover evidence of drug possession or distribution in Jemison’s vehicle. Accordingly, we do not believe Officer Clack-ley violated the rule announced in
 
 Gant
 
 by searching Jemison’s car for evidence of drug-related offenses.
 

 Moreover, even if we are to assume that Officer Clackley violated
 
 Gant
 
 by searching Jemison’s vehicle, we must determine whether the suppression of the evidence gathered from the vehicle pursuant to the exclusionary rule is an appropriate remedy for this
 
 Gant
 
 violation. In
 
 Davis,
 
 the Court found that although the police officer violated the rule announced in
 
 Gant,
 
 the application of the exclusionary rule to the evidence seized from the vehicle would not be an appropriate remedy. The Court explained:
 

 “ ‘[T]he exclusionary rule is not an individual right’; it ‘applies only where it “result[s] in appreciable deterrence,” ’ and ‘the benefits of deterrence must outweigh the costs.’
 
 Herring v. United States,
 
 555 U.S. 135, 129 S.Ct. 695, 700, 172 L.Ed.2d 496 (2009) (quoting
 
 [United States
 
 v.]
 
 Leon,
 
 468 U.S. [897] at 909, 104 S.Ct. 3405 [(1984)]) (alteration in original). Whether to suppress evidence obtained from an unconstitutional search thus ‘turns on the culpability of the police and the potential of exclusion to deter wrongful police conduct.’
 
 Id.
 
 at 698, 129 S.Ct. 695. Because the exclusionary rule ‘cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity,’ the Supreme Court has established an exception to the rule’s application for cases in which the officers who conducted an illegal search ‘acted in the objectively reasonable belief that their conduct did not violate the Fourth Amendment.’
 
 Leon,
 
 468 U.S. at 919, 104 S.Ct. 3405.
 

 [[Image here]]
 

 “In this case, Sergeant Miller did not deliberately violate Davis’s constitutional rights. Nor can he be held responsible for the unlawfulness of the search he conducted. At the time of the search, we adhered to the broad reading of
 
 Belton
 
 that the Supreme Court later disavowed in
 
 Gant,
 
 and a search performed in accordance with our erroneous interpretation of Fourth Amendment law is not culpable police conduct. Law enforcement officers in this circuit are entitled to rely on our decisions, and ‘[penalizing the officer for the [court’s] error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations,’
 
 Leon,
 
 468 U.S. at 921, 104 S.Ct. 3405. As the
 
 *848
 
 Tenth Circuit explained, the general ‘purpose of the exclusionary rule is to deter misconduct by law enforcement officers, not other entities,’ and there would be little ‘significant deterrent effect in excluding evidence based upon the mistakes of those uninvolved in or attenuated from law enforcement.’
 
 McCane,
 
 573 F.3d at 1044.
 

 “Because the exclusionary rule is justified solely by its potential to deter police misconduct, suppressing evidence obtained from an unlawful search is inappropriate when the offending officer reasonably relied on well-settled precedent.
 

 [[Image here]]
 

 “With this decision, we join the Fifth and Tenth Circuits in refusing to apply the exclusionary rule when the police have reasonably relied on clear and well-settled precedent.
 
 See, [United States
 
 v.]
 
 McCane,
 
 573 F.3d [1037] at 1045 [ (10th Cir.2009)
 
 cert. denied,
 
 - U.S. -, 130 S.Ct. 1686 (2010)] (‘[T]his court declines to apply the exclusionary rule when law enforcement officers act in objectively reasonable reliance upon the settled case law of a United States Court of Appeals.’);
 
 [United State
 
 v.]
 
 Jackson,
 
 825 F.2d [853] at 866 [(5th Cir.1987)] (‘[T]he exclusionary rule should not be applied to searches which relied on Fifth Circuit law prior to the change of that law....’). We stress, however, that our precedent on a given point must be unequivocal before we will suspend the exclusionary rule’s operation. We have not forgotten the importance of the ‘incentive to err on the side of constitutional behavior,’ and we do not mean to encourage police to adopt a ‘ “let’s-wait-until-it’s-decided approach” ’ to ‘unsettled’ questions of Fourth Amendment law.
 
 Johnson,
 
 457 U.S. at 561, 102 S.Ct. 2579 (quoting
 
 Desist v. United States,
 
 394 U.S. 244, 277, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969) (Fortas, J., dissenting)).
 

 “The clarity of the
 
 Belton
 
 rule we followed before
 
 Gant
 
 is thus critical to our decision today. Although the Court in
 
 Gant
 
 insisted that
 
 Belton
 
 could have been interpreted in either of two ways, it also acknowledged that
 
 Belton
 
 was premised on a ‘faulty assumption’ to which the doctrine of stare decisis did not require adherence.
 
 Gant,
 
 129 S.Ct. at 1719, 1723. Indeed, we, like most of the other courts of appeals, treated the broader, permissive reading of
 
 Belton
 
 as well-settled. It is precisely in situations like this, when the permissibility of a search was clear under precedent that has since been overturned, that applying the good-faith exception makes sense. When the police conduct a search in reliance on a bright-line judicial rule, the courts have already effectively determined the search’s constitutionality, and applying the exclusionary rule on the basis of a judicial error cannot deter police misconduct.
 
 Cf. Krull,
 
 480 U.S. at 360 n. 17, 107 S.Ct. 1160. (‘[T]he question whether the exclusionary rule is applicable in a particular context depends significantly upon the actors who are making the relevant decision that the rule is designed to influence.’).
 

 “Our decision here is therefore consistent with our holding in
 
 United States v. Chanthasouxat,
 
 342 F.3d 1271, 1280 (11th Cir.2003), that ‘the good faith exception to the exclusionary rule ... should not be extended to excuse a vehicular search based on an
 
 officer’s
 
 mistake of law (emphasis added). The justifications for the good-faith exception do not extend to situations in which police officers have interpreted ambiguous precedent or relied on their own extrapolations from existing caselaw. When the police rely on novel extensions of our precedent, they engage in the sort
 
 *849
 
 of legal analysis better reserved to judicial officers, whose ‘detached scrutiny ... is a more rehable safeguard against improper searches than the hurried judgment of a law enforcement officer engaged in the often competitive enterprise of ferreting out crime,’
 
 United States v. Chadwick,
 
 433 U.S. 1, 9, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977) (quotation marks and citation omitted), quoted in
 
 Leon,
 
 468 U.S. at 913-14, 104 S.Ct. 3405. When law enforcement officers rely on precedent to resolve legal questions as to which ‘[rjeasonable minds ... may differ,’
 
 Leon,
 
 468 U.S. at 914, 104 S.Ct. 3430, the exclusionary rule is well-tailored to hold them accountable for their mistakes.
 

 “Although an officer’s mistake of law cannot provide objectively reasonable grounds for a search,
 
 Chanthasouxat,
 
 342 F.3d at 1279, the mistake of law here was not attributable to the police. On the contrary, the governing law in this circuit unambiguously allowed Sergeant Miller to search the car. Relying on a court of appeals’ well-settled and unequivocal precedent is analogous to relying on a statute,
 
 cf. [Illinois
 
 v.]
 
 Krull,
 
 480 U.S. 340, 107 S.Ct. 1160, 94 L.Ed.2d 364 [(1987)], or a facially sufficient warrant,
 
 cf. Leon,
 
 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677—not to personally misinterpreting the law.
 

 “In this case, Sergeant Miller performed a search that our contemporaneous interpretation of
 
 Belton
 
 clearly permitted. Had the Supreme Court not subsequently rejected that interpretation in
 
 Gant,
 
 we undoubtedly would have upheld the search as constitutional. Because the search was objectively reasonable under our then-binding precedent, suppressing the gun found in Davis’s jacket would serve no deterrent purpose. In accordance with our holding that the good-faith exception allows the use of evidence obtained in reasonable reliance on well-settled precedent, we refuse to apply the exclusionary rule here.”
 

 598 F.3d at 1265-68.
 

 At the time Officer Clackley searched Jemison’s vehicle, it is unequivocal that the rule announced in
 
 Belton
 
 concerning automobile searches carried out as incident to lawful arrests was the controlling precedent in Alabama.
 
 See, e.g., Sheffield v. State,
 
 606 So.2d 183, 187 (Ala.Crim.App.1992) (“After arresting the driver of an automobile, an officer ‘may, as a contemporaneous incident of that arrest, search the passenger compartment’ of that car, including ‘the contents of any containers found within the passenger compartment.’
 
 New York v. Belton,
 
 453 U.S. 454, 460, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981).”);
 
 Mason v. State,
 
 768 So.2d 981 (Ala.Crim.App.1998), aff'd, 768 So.2d 1008 (Ala.2000) (“Even if we were to conclude that the search was not authorized pursuant to an inventory search, the trial court’s denial of the motion to suppress is due to be affirmed because the search of the appellant’s vehicle was lawful as a search incident to an arrest.
 
 Sheffield,
 
 606 So.2d at 187.”). Thus, like the Court in
 
 Davis,
 
 we conclude that no mistake of law was attributable to Officer Clackley in that after arresting Jemison, under
 
 Belton,
 
 Officer Clackley was authorized to search Jemi-son’s vehicle as incident to the arrest based on well settled precedent.
 

 Applying the exclusionary rule to suppress the evidence seized from Jemison’s vehicle is not an appropriate remedy for Officer Clackley’s good-faith reliance on the well settled
 
 Belton
 
 precedent because doing so serves no deterrent purpose to unconstitutional police searches.
 
 See Ex parte Tyson,
 
 784 So.2d 357, 364 (Ala.2000), quoting
 
 Leon,
 
 468 U.S. at 906-08 (“The [exclusionary rule] operates as ‘a judicially created remedy designed to safeguard
 
 *850
 
 Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved.’
 
 United States v. Calandra,
 
 [414 U.S. 338, 348 (1974)].”) (alteration in original). Thus, even if we were to assume that Officer Clackley violated
 
 Gant
 
 by searching Jemison’s vehicle after his lawful arrest, we do not believe the exclusionary rule should be applied to Officer Clackley’s good-faith actions. Accordingly,
 
 Gant
 
 affords Jemison no relief with respect to his claim that the evidence seized from his vehicle was due to be suppressed.
 

 As previously discussed, Officer Clack-ley did not subject Jemison to an unlawful seizure. Likewise, the bag containing the Ecstasy pills was not recovered during a search implicating any Fourth Amendment right of Jemison. Accordingly, the trial court erred in granting Jemison’s motion to suppress. Based on the foregoing, the judgment of the trial court is reversed and this case remanded for the circuit court to set aside its order granting Jemison’s motion to suppress and to restore Jemison’s case to its active docket.
 

 APPLICATION OVERRULED; OPINION OF JULY 30, 2010, WITHDRAWN; OPINION SUBSTITUTED; REVERSED AND REMANDED.
 

 WISE, P.J., and WELCH, WINDOM, and MAIN, JJ., concur.
 

 [1]
 

 . "Ecstasy” is the common street name for N-Benzylpiperazine.
 

 [2]
 

 " 2 'Final' in this context refers to any 'case in which a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied.’
 
 Griffith,
 
 479 U.S. at 321 n. 6, 107 S.Ct. 708.”